IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANE ZION, Individually and as Personal Representative of the Estate of Nicholas Haniotakis, Taylor Haniotakis, Nikki Haniotakis, Benjamin Haniotakis, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 09-0383<br><br>Hon. Joy F. Conti |
| -vs- | ) ) | |
| TROOPER SAMUEL NASSAN, SGT. TERRENCE DONNELLY, LT. DAVID HECKMAN, CAPT. SHELDON EPSTEIN, COMMISSIONER FRANK PAWLOWSKI, and MAJOR TERRY SEILHAMER, In Their Individual Capacities, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____/ | | |

## AMENDED COMPLAINT AND RELIANCE ON JURY REQUEST

NOW COMES Plaintiffs, by and through their attorneys, Fieger, Fieger, Kenney, Johnson & Giroux, P.C. and Mills & Henry, and for their Amended Complaint against the above-named Defendants, state as follows:

## INTRODUCTION

1.     This is an action for money damages brought pursuant to 42 USC Sections 1983 and 1988, and the 4th Amendment (through the 14th Amendment) to the United States Constitution, and under the statutes and common law of the State of Pennsylvania against Trooper Samuel Nassan, Sgt. Terrence Donnelly, Lt. David Heckman, Capt. Sheldon Epstein, Commissioner Frank Pawlowski, and Maj. Terry Seilhamer, in their individual capacities.  Jurisdiction is based upon 28 USC

Sections 1331 and 1343 and on the pendent/supplemental jurisdiction of this Federal District Court to entertain claims arising under state law. The amount in controversy in this case is well in excess of $75,000.00, the courts jurisdictional limit.

## PARTIES

2.      Plaintiff, Diane Zion, is the duly appointed Personal Representative of the Estate of Nicholas Haniotakis, Deceased. She files this lawsuit in both her individual capacity and her representative capacity on behalf of the Estate of Nicholas Haniotakis.

3.      Plaintiffs Taylor Haniotakis, Nikki Haniotakis and Benjamin Haniotakis are the putative children of Decedent Nicholas Haniotakis.

4.      Defendant, Samuel Nassan (hereinafter referred to as Nassan), is and was at all times relevant, an officer of the Pennsylvania State Police and acting under color of state law. Upon information and belief, he is a patrol trooper with Troop B in Fayette County, Pennsylvania. He is being sued in his individual capacity.

5.      Defendant, Sgt. Terrence Donnelly (hereinafter referred to as Donnelly), is and was at all times relevant, an officer of the Pittsburgh Police Department and acting under color of state law. Upon information and belief, he is a patrol officer who was working with Trooper Nassan on the night of the subject shooting. He is being sued in his individual capacity.

6.      Defendant, Colonel Frank Pawlowski, is the Pennsylvania State Police Commissioner. He is being sued in his individual capacity. As the Commissioner of the State Police, Pawlowski exercises administrative, command,

and fiscal authority and responsibility over the Department. He oversees a budget of over half a billion dollars, and commands a statewide complement of more than 6,400 enlisted and civilian personnel, which includes over 4,600 State Police Troopers. As Commissioner, he is empowered by statute to assist the Governor by enforcing the law and preserving the peace through the detection of crime, apprehension of criminals, and patrol of the highways. His duties include addressing Trooper misconduct and discipline. As Commissioner, as well as in his prior positions as Department Director and/or Deputy Commissioner, Defendant Pawlowski received specific information and/or reports regarding Trooper Nassan's propensity for violence, misconduct while on duty, his record of confrontations with other state and local police officers and supervisors, as well as his fatal shooting of an unarmed 12 year old boy in the back which a civil jury concluded constituted excessive force and a violation of the young boy's constitutional rights. As the Commissioner, Colonel Pawlowski, was notified of the $28 million verdict against Nassan, was involved in the decision to settle the verdict in October of 2008 and worked with the Governor's office to facilitate the settlement of the verdict. Defendant Pawlowski is part of the group of officials who decided to retain Nassan as a State Trooper notwithstanding his horrendous record and his history of violent propensities.

       7.     Defendant, Major Terry Seilhamer, as an Area Commander, answers to the Police Commissioner and is responsible for supervising the three troops under his command, which includes Troop B where Nassan is stationed. Defendant Seilhamer is being sued in his individual capacity.  As the Area Commander, Defendant Seilhamer received specific information and/or reports

regarding Trooper Nassan's propensity for violence, misconduct while on duty, his record of confrontations with other state and local police officers and supervisors, as well as his fatal shooting of an unarmed 12 year old boy in the back, which a civil jury concluded constituted excessive force and a violation of the young boy's constitutional rights. Defendant Seilhamer was part of the group of officials who decided to retain Nassan as a State Trooper notwithstanding all of the aforementioned information.

8.      Defendant Captain Sheldon Epstein is the Commanding Officer of Pennsylvania State Police Troop B, which is where Nassan is stationed. Defendant Epstein is being sued in his individual capacity.  Defendant Epstein answers directly to Defendant Seilhamer, the Area Commander. Defendant Epstein was in charge of discipline of the Troopers under his command. As the Commanding Officer, Defendant Epstein received specific information and/or reports regarding Trooper Nassan's propensity for violence, misconduct while on duty, his record of confrontations with other state and local police officers and supervisors, as well as his fatal shooting of an unarmed 12 year old boy in the back, which a civil jury concluded constituted excessive force and a violation of the young boy's constitutional rights. Defendant Epstein is part of the group of officials who decided to retain Nassan notwithstanding Nassan's prior record and his history for violent propensities.

9.      Defendant Lt. David Heckman is the Station Commander and direct supervisor of Trooper Nassan.  He was the Crime Unit Commander for the Michael Ellerbe shooting which is the case concerning the unlawful shooting of an unarmed 12 year old boy in the back which resulted in the boy's death.  After a

jury found Nassan guilty of violating Michael Ellerbe's civil rights, Lt. Heckman was promoted.  At all times relevant, Heckman knew or should have known of actual or potential problems associated with Nassan acting as a trooper with the State Police and yet Heckman failed to do anything to correct or prevent the problems from occurring.  Moreover, Heckman affirmatively covered up some of Trooper Nassan's prior problems.  In so doing, Heckman has condoned, ratified and/or encouraged the unlawful and/or improper tactics of Trooper Nassan, past and present.

## COMMON FACTUAL ALLEGATIONS

10.     On or about March 15, 2009 between the hours of 1:00 a.m. and 2:00 a.m., Nicholas Haniotakis was being followed by Nassan and Donnelly who claimed they were following Haniotakis' vehicle because it had a broken headlight.

11.     Nassan and Donnelly radioed dispatch and informed them that they were following a vehicle which they described for dispatch.  They also provided the license plate number.

12.     At all times material and relevant, Nassan and Donnelly did not know who was driving the subject vehicle.  Nassan and Donnelly possessed no information about the driver including his condition, state of mind, intentions or any other information.

13.     At all times material and relevant, Defendants Nassan and Donnelly did not see the driver of the subject vehicle committing any violent felony or crime.

14.     Upon information and belief, Nassan and Donnelly were instructed by dispatch and/or a superior officer to discontinue their pursuit of the Haniotakis vehicle.  Significantly, however, Defendants Nassan and Donnelly refused to

follow those instructions and continued to follow the vehicle.

15.    Upon information and belief, when Mr. Haniotakis stopped his vehicle, Defendants Nassan and Donnelly exited the police vehicle with their weapons drawn.  As they approached the vehicle they began to shoot multiple times in the direction of the driver thereby striking Mr. Haniotakis first in his extremities and then ultimately Defendant Nassan shot Mr. Haniotakis through the back thereby inflicting fatal injuries.

16.    At all times material and relevant, Nicholas Haniotakis did not possess and/or brandish a weapon including a gun or a knife.

17.    At all times material and relevant, Nicholas Haniotakis posed no threat of harm to the defendant officers and/or to anyone else at or near the scene of the shooting.  The officers had been traveling in a police car.  Police officers are taught to use their vehicle as a barrier when needed or necessary for protection. They are also taught to use distance because the more distance between themselves and persons they are pursuing, the more time they have to respond and/or react.

18.    At all times material, the officers had their vehicle as a barrier if they chose to use it.

19.    At all times material and relevant, neither Nassan nor Donnelly had any justifiable excuse or reason to discharge their weapons at Mr. Haniotakis, who was unarmed, was facing away from Nassan and Donnelly and did not pose a threat of harm to the officers or anyone else in the vicinity.

20.    Nicholas Haniotakis was first struck by the Defendants' bullets in his extremities, after which he was shot in the back by Defendant Nassan.  The bullet ripped through his flesh, perforated vital internal organs and caused tremendous

pain and suffering.

21.    Nicholas Haniotakis did not die immediately and instead suffered

great conscious pain and suffering as a direct and proximate result of the said acts

of Defendants Nassan and Donnelly.  Nicholas Haniotakis suffered the following

injuries and damages:

    a.    Violation of his constitutional rights under the 4th
        Amendment (through the 14th Amendment) to the
        United States Constitution including, but not limited to,
        the right to be free from an unreasonable seizure of his
        person and/or to be free from the unnecessary and
        excessive use of deadly force;

    b.    Loss of his life;

    c.    Physical pain and suffering and emotional trauma and
        suffering;

    d.    Medical, funeral and burial costs;

    e.    Loss of wages and/or earning capacity;

    f.    Loss of services, care, society, love, companionship,
        comfort and protection between Nicholas Haniotakis
        and all family members and/or persons of his Estate.

22.    Prior to the subject shooting, Defendant Nassan had a long history of

violent propensities and violent occurrences dating back to his days in the military.

Defendant Nassan, a trained sharp shooter, was forced to leave the military

because of his violent run-ins with other officers including but not limited to severe

facial fractures and head injuries he inflicted upon another high-ranking officer

within the military.

23.    After leaving the military without an honorable discharge, Nassan

applied to the Pennsylvania State Police.  A background check was to be

performed by the Pennsylvania State Police before Nassan would be allowed to

be sworn as an officer.  The alleged "background check" was performed by Trooper Frank Murphy who shared a close personal relationship with Nassan. Additionally, Frank Murphy had his own character problems including his own history of violence and a propensity for perjury.

24.     Upon information and belief, Frank Murphy covered up and/or intentionally overlooked various aspects of Trooper Nassan's history and violent propensities including those associated with his days in the military.  Upon information and belief, certain portions of Trooper Nassan's Form 214 relative to the military and his violent propensities were redacted.  It is believed that Frank Murphy did not act alone and that he engaged in these activities in concert with others including State Police supervisors who sought to ensure that Nassan received a position with the State Police.

25.     After being sworn as a state trooper, Defendant Nassan became involved in a number of altercations with both State Police supervisors and local police officers.  Specifically, Trooper Nassan engaged in a physical confrontation with supervisor Barry Gaston of the Pennsylvania State Police.  Subsequently, Gaston was moved and/or relocated as a result of the altercation even though Nassan had been the instigator or aggressor.  On another occasion, Trooper Nassan had a physical confrontation with Cpl. Tony Guy, and again Nassan was given preferential treatment.

26.     As Commissioner, as well as in his prior positions as Department Director and/or Deputy Commissioner, Defendant Pawlowski has received specific information and/or reports regarding Trooper Nassan's propensity for violence, misconduct while on duty, and the aforementioned altercations.

27.     As the Area Commander responsible for supervising the three troops under his command, including Troop B where Nassan is stationed, Defendant Seilhamer has received specific information and/or reports regarding Trooper Nassan's propensity for violence, misconduct while on duty, and the aforementioned altercations.

28.     As the Commanding Officer who was in charge of discipline, Defendant Epstein has received specific information and/or reports regarding Trooper Nassan's propensity for violence, misconduct while on duty, and the aforementioned altercations.

29.     As the Station Commander and direct supervisor of Trooper Nassan, Defendant Heckman has received specific information and/or reports regarding Trooper Nassan's propensity for violence, misconduct while on duty, and the aforementioned altercations.

30.     Despite Defendants Pawlowski, Seilhamer, Epstein, and Heckman's knowledge of Trooper Nassan's propensity for violence, misconduct while on duty and the aforementioned confrontations, Trooper Nassan was never disciplined for the confrontations he initiated against supervisors Gaston and Guy or any other misconduct. Upon information and belief, these occurrences were covered up and/or kept away from Trooper Nassan's employment file.

32.     Trooper Nassan also had a number of complaints and run-ins with members of the public.  More often than not, the complaints against Trooper Nassan related to his propensity to use violence against members of the public without excuse or justification.

33.     Upon information and belief, Trooper Nassan also had three or more

heated verbal and/or physical confrontations with members of the City of Pittsburgh Police Department.  Similarly these confrontations were not made part of Trooper Nassan's employment file.  Nevertheless, they became well known to Trooper Nassan's supervisors – Defendants Pawlowski, Seilhamer, Epstein and Heckman – either directly or indirectly, as all reports of Nassan's behavior went up the chain of command, including the Commissioner's Office.

34.     In February of 2008, Trooper Nassan was found guilty by a civil jury for having engaged in deliberating violating the civil rights of a 12 year old boy by fatally shooting him in the back, despite the fact that the young boy was unarmed and running away.  It was also determined that Trooper Nassan had been untruthful about his description of the events leading up to the shooting.

35.     Throughout the litigation with regard to Nassan's fatal shooting of the 12 year old boy, testimony and evidence established that Nassan had a history of violent behavior, engaged in misconduct while on duty and was involved in confrontations with other state and local police officers and supervisors.

36.     Trooper Nassan's supervisors – Defendants Pawlowski, Seilhamer, Epstein and Heckman – were aware of, monitored and participated in the defense of Trooper Nassan for his deliberate violation of the civil rights of a 12 year old boy by fatally shooting him in the back, despite the fact that the young boy was unarmed and running away.

37.     On March 14, 2008, Pennsylvania Governor Ed Rendell reported that the $28 million civil verdict against Trooper Nassan prompted the State of Pennsylvania to review the Pennsylvania State Police procedures and guidelines. Governor Rendell stated, "Obviously we're going to have to take some remedial

steps. We're taking a look at it now. . . . You have to look to see if there is a pattern." Governor Rendell left the decision to the Police Commissioner. (http://pittsburghlive.com/x/pittsburghtrib/news/cityregion/s_557383.html)

38.    As Commissioner, Colonel Pawlowski interacted with the Governor's office with regard to the $28 million verdict against Trooper Nassan, the eventual settlement and reviewing the Pennsylvania State Police procedures and guidelines. Nevertheless, no disciplinary action was taken against Trooper Nassan and no steps were taken to curb his future behavior.

39.    In December of 2008, Lt. David Heckman, engaged in horrendous and unethical conduct by forcing his subordinate to change Trooper Nassan's employment records to purge evidence of violent propensities.

40.    Specifically, Lt. David Heckman ordered Cpl. Ken Munshower to change Trooper Nassan's annual evaluation.  Cpl. Munshower originally wrote Trooper Nassan's annual evaluation stating that, in his opinion, Nassan "needed improvement" as a State Trooper.  Upon reading same, Lt. David Heckman ordered Cpl Munshower, over Munshower's strenuous objections, to change the evaluation so that it stated Nassan was a "satisfactory" State Trooper.

41.    Lt. David Heckman was the Crime Unit Commander for the State Police in the Michael Ellerbe case.  It was Heckman and his unit which ultimately covered up Nassan's culpability by deciding that from the prospective of the State Police, Nassan did nothing wrong in shooting Michael Ellerbe in the back even though he was unarmed and running away.  What is more, after it was proven in court that Nassan had been untruthful about what had occurred with Michael Ellerbe, neither Heckman nor any other supervising official endeavored to change

~ 12 ~

the crime unit's conclusions and/or to reprimand or discipline Nassan.

42.     At all times material and relevant, Trooper Nassan's supervisors including Heckman, Pawlowski, Epstein and Seilhamer were well aware of Trooper Nassan's violent history and, as a matter of defacto policy and procedure, permitted same and encouraged it in terms of appropriate training.

43.     At all times material and relevant, it was the decision of Pawlowski, Epstein, Heckman and Seilhamer to retain the services of Nassan even though there were numerous occurrences which gave sufficient reason and cause to terminate Nassan from services with the Pennsylvania State Police for his violent and illegal behavior involving violence.

44.     Instead of suspending or disciplining Nassan, all of the supervisors including Pawlowski, Seilhamer, Heckman and Epstein refused to discipline Nassan, changed or modified records and/or looked the other way and thus tacitly encouraged such behavior.  In doing so, all of the supervisors condoned, ratified or encouraged the excessive use of force by Trooper Nassan on numerous occasions as a matter of policy.

## **COUNT I**

### **42 U.S.C. SECTION 1983 - EXCESSIVE FORCE AND/OR UNLAWFUL USE OF DEADLY FORCE - DEFENDANTS NASSAN AND DONNELLY**

45.     Plaintiffs incorporate by reference their allegations contained in Paragraphs 1 through 44, above, as though fully set forth herein.

46.     Plaintiffs seek damages for injuries suffered by Nicholas Haniotakis and the members of his family as set forth and described above pursuant to 42 U.S.C. §1983 against Defendants Nassan and Donnelly who, while acting under

color of law, violated Nicholas Haniotakis' civil rights including the right to be free from unlawful seizure of his person and the use of excessive force and/or unlawful deadly force against his person.

47.    Pursuant to the 4th Amendment (through the 14th Amendment) to the United States Constitution, at all times relevant, Nicholas Haniotakis had the right to be free from unlawful seizure, excessive force, and the unlawful use of deadly force.

48.    At all times relevant, as police officers acting under color of law, Defendants Nassan and Donnelly were required to obey the laws of the United States including those laws identified and described the 4th Amendment to the United States Constitution.

49.    To the contrary, in clear violation of the United States Constitution, including but not limited to the 4th Amendment, Defendants Nassan and Donnelly unlawfully seized Nicholas Haniotakis, used excessive force against him and unlawfully used deadly force thereby inflicting horrendous personal injuries and ultimately death from which certain damages naturally followed to the members of Mr. Haniotakis' family and/or Estate.

50.    Pursuant to 42 U.S.C. §1983, Defendants are liable for all damages allowed under federal law and under the Pennsylvania Wrongful Death statute and Survival statute.  To the extent that the damages allowable and/or recoverable under one or both of the statutes are deemed insufficient to fully compensate the Plaintiffs and/or to punish or deter the Defendants, this Court must order additional damages to be allowed so as to satisfy any and all such inadequacies.

51.    Pursuant to the unlawful and unconstitutional actions perpetrated by

~ 14 ~

Defendants, Nicholas Haniotakis and/or the members of his family have suffered the following injuries and damages for which compensation is hereby demanded:

      a.     Reasonable medical, funeral and burial expenses;

      b.     Emotional distress;

      c.     Loss of personal freedom and liberty;

      d.     Pain and suffering;

      e.     Fright and shock;

      f.     Horror, outrage and indignity;

      g.     Economic damages including lost wages and/or loss of earning capacity;

      h.     Exemplary damages;

      i.     Loss of love, society and companionship for the members of the Decedent's Estate;

      j.     Loss of services, gifts and/or gratuities;

      k.     An award of punitive damages;

      l.     An award of hedonic damages;

      m.     Reasonable attorney fees and costs;

      n.     Expenses for the administration of the Estate; and

      o.     All other such relief which appears reasonable and just under the circumstances.

WHEREFORE, Plaintiffs request that this Court award to them and against the Defendants the following damages and/or relief:

      A.     Compensation for all allowable economic damages;

      B.     Compensation for all allowable non-economic damages;

      C.     Punitive damages;

D.    Hedonic damages;

E.    Exemplary damages;

F.    Attorney fees and costs;

G.    Interest on all allowable damages;

H.    Any and all additional damages allowed under Pennsylvania law
including the Wrongful Death statute and/or the Survival statute;

I.    Any and all additional damages allowed under 42 U.S.C. §1983
and/or federal common law; and

J.    Such other and further relief as appears reasonable and just under
the circumstances of this case.

## COUNT II
## 42 U.S.C. §1983 - VIOLATION OF CIVIL RIGHTS THROUGH SUPERVISION CUSTOMS, POLICIES AQUIESENCE AND TRAINING - DEFENDANTS PALOWSKI, SEILHAMER, HECKMAN AND EPSTEIN

52.    Plaintiffs incorporate by reference their allegations contained in

Paragraphs 1 through 51, above, as though fully set forth herein.

53.    At all times material and relevant, Pawlowski, Epstein, Seilhamer

and Heckman had actual and/or constructive knowledge that Trooper Nassan was

engaged in conduct that posed a pervasive and unreasonable risk of constitutional

injury to members of the public.  They knew or should have known he was forced

to leave the military because of his propensities for violence.  They knew or should

have known that the cadet background investigation performed on him by Trooper

Frank Murphy was inadequate and/or untruthful.  They knew that after joining the

State Police, Trooper Nassan continued on a path of improper, abusive and violent

behavior.  This conduct included but was not limited to various confrontations,

physical and otherwise, with the public, supervisors, co-workers and/or members

of local law enforcement departments.

~ 16 ~

54.     Pawlowski, Seilhamer, Epstein and Heckman knew who Trooper Nassan was before the civil verdict of 28 million was entered against him. After the verdict, they learned through lines of communication standard in the state police that Nassan, according to the jury, lied about the circumstances of his shot to the back of Michael Ellerbe.

55.     Pawlowski, Seilhamer, Epstein and Heckman each learned, before or after the verdict, the significant points about the background of Trooper Nassan. As an example, they learned he was asked to leave the military even though he wanted to stay. Indeed, his release from duty form states, "Separation Code: JGHI" and "Reentry Code RE-1B." These codes mean that Nassan failed to meet minimum standards for staying in the service and that he requested to stay in the military service but was rejected.

56.     Notwithstanding the information that Pawlowski, Seilhamer, Epstein and Heckman possessed regarding Trooper Nassan's character and fitness, the supervisor's response to the information was so inadequate as to demonstrate deliberate indifference to, or tacit authorization of, continual, offensive, improper and illegal conduct by Trooper Nassan. Moreover, such conduct indicates that it was the policy and procedure of these individuals to permit unconstitutional and illegal conduct.

57.     There is an affirmative causal link between the acts and/or omissions of the aforementioned supervisors and the injuries and damages claimed by the Plaintiffs herein. By continually looking the other way and/or covering up Trooper Nassan's transgressions and by retaining Nassan, the State Police supervisors condoned, ratified and encouraged excessive use of force by Trooper Nassan.

Trooper Nassan should have been terminated after a jury found that he had lied about his shooting of a young boy in the back and after a finding that Nassan deliberately violated that boy's constitutional rights by shooting him in the back when he was running away without any weapon on his person.  Nassan should have been relieved of his duty at any time during his numerous confrontations with supervisors and/or other police officers.

58.     Instead of disciplining, suspending or terminating Nassan, the supervisors engaged in conduct that made it possible for Nassan to avoid scrutiny.  In that manner, Defendants caused the horrendous injuries and death of Nicholas Haniotakis.  Therefore, through their customs, policies, procedures, practices, defacto policies and training of Nassan, these Defendants violated Nicholas Haniotakis' civil rights under the United States Constitution including, but not limited to, those identified in the 4th Amendment.

59.     Defendants Pawlowski, Seilhamer, Epstein and Heckman must be held responsible for the injuries and damages suffered by Nicholas Haniotakis as well as the members of his family and/or Estate including, but not limited to the following:

   a.     Reasonable medical, funeral and burial expenses;

   b.     Emotional distress;

   c.     Loss of personal freedom and liberty;

   d.     Pain and suffering;

   e.     Fright and shock;

   f.     Horror, outrage and indignity;

   g.     Economic damages including lost wages and/or loss of

earning capacity;

h.    Exemplary damages;

i.    Loss of love, society and companionship for the
      members of the Decedent's Estate;

j.    Loss of services, gifts and/or gratuities;

k.    An award of punitive damages;

l.    An award of hedonic damages;

m.    Reasonable attorney fees and costs;

n.    Expenses for the administration of the Estate; and

o.    All other such relief which appears reasonable and just
      under the circumstances.

WHEREFORE, Plaintiffs request that this Court award to them and against

the Defendants the following damages and/or relief:

A.    Compensation for all allowable economic damages;

B.    Compensation for all allowable non-economic damages;

C.    Punitive damages;

D.    Hedonic damages;

E.    Exemplary damages;

F.    Attorney fees and costs;

G.    Interest on all allowable damages;

H.    Any and all additional damages allowed under Pennsylvania law
      including the Wrongful Death statute and/or the Survival statute;

I.    Any and all additional damages allowed under 42 U.S.C. §1983
      and/or federal common law; and

J.    Such other and further relief as appears reasonable and just under
      the circumstances of this case.

## COUNT III
## ASSAULT AND BATTERY – DEFENDANT NASSAN

60.     Plaintiffs hereby incorporate by reference their allegations contained in

Paragraphs 1 through 59, above, as though fully set forth herein.

61.     The facts described above are sufficient to sustain state tort law

claim assault and battery against Defendant Nassan.

62.     Therefore, Plaintiffs hereby request reasonable and allowable

compensation for the injuries and damages which were caused by Defendant

Nassan's tortious conduct including but not limited to the following:

     a.     Loss of life;

     b.     Physical pain and suffering and emotional trauma;

     c.     Reasonable medical, funeral and burial costs;

     d.     Loss of wages and/or earning capacity;

     e.     Loss of services, gifts, gratuities, care, society, love,
         companionship, comfort and protection between
         Nicholas Haniotakis and all family members and/or
         persons of his Estate;

     f.     Reasonable attorney fees and costs;

     g.     Expenses for the administration of the Estate; and

     h.     All other such relief which appears reasonable and just
         under the circumstances.

WHEREFORE, Plaintiffs request that this Court award to them and against the

Defendants the following damages and/or relief:

     A.     Compensation for all allowable economic damages;

     B.     Compensation for all allowable non-economic damages;

     C.     Punitive damages;

D.      Hedonic damages;

E.      Exemplary damages;

F.      Attorney fees and costs;

G.      Interest on all allowable damages;

H.      Any and all additional damages allowed under Pennsylvania law including the Wrongful Death statute and/or the Survival statute;

I.      Such other and further relief as appears reasonable and just under the circumstances of this case.

Respectfully submitted,


 /s/ Austin P. Henry
AUSTIN P. HENRY (PA Id. 58278)
223 Fourth Avenue
Pittsburgh, PA  15222
(412) 471-2442

 /s/ Geoffrey N. Fieger
GEOFFREY N. FIEGER (P-30441)
Attorney for Plaintiffs
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555

Dated: December 3, 2009

## **RELIANCE ON JURY REQUEST**

Plaintiffs, by and through their attorneys, Fieger, Fieger, Kenney, Johnson & Giroux, P.C. and Mills & Henry, hereby relay on their jury request previously filed herein.

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Austin P. Henry_____
AUSTIN P. HENRY (PA Id. 58278)
223 Fourth Avenue
Pittsburgh, PA  15222
(412) 471-2442

 /s/ Geoffrey N. Fieger_____
GEOFFREY N. FIEGER (P-30441)
Attorneys for Plaintiffs
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555

</div>

Dated:  December 3, 2009