| | |
|---|---|
| **DIANE ZION** *individually and as Representative of the Estate of Nicholas Haniotakis.* **TAYLOR HANIOTAKIS, NIKKI HANIOTAKIS, BENJAMIN HANIOTAKIS,** | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO.   09-383 |
| **TROOPER SAMUEL NASSAN, SGT. TERRENCE DONNELLY, LT. DAVID HECKMAN, CAPT. SHELDON EPTEIN, COMMISSIONER FRANK PAWLOWSKI, MAJOR TERRY SEILHAMER** *in Their Individual Capacities*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge

### *Background*

Pending before this court are several motions, including several motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion for sanctions filed pursuant to Federal Rule of Civil Procedure 11.  On December 29, 2009, defendant Trooper Samuel Nassan ("Nassan") filed a motion for sanctions.  (Docket No. 63.)  On January 26, 2010, three motions to dismiss were filed: (1) motion to dismiss amended complaint filed by Nassan (Docket No. 71), (2) motion to dismiss amended complaint filed by defendant Sergeant Terence Donnelly ("Donnelly") (Docket No. 70), and (3) motion to dismiss filed by defendants Commissioner Frank Pawlowski ("Pawlowski"), Major Terry Seilhamer ("Seilhamer"), Captain Sheldon

Epstein ("Epstein"), and Lieutenant David Heckman ("Heckman") (collectively "supervisory defendants," and together with Nassan and Donnelly, "defendants") (Docket No. 73). All three pending motions to dismiss relate to the amended complaint filed by plaintiffs Diane Zion ("Zion"), Taylor Haniotakis, Nikki Haniotakis, and Benjamin Haniotakis (collectively "plaintiffs"). (Docket No. 54.)

On April 1, 2009, plaintiffs filed the initial complaint. (Docket No. 1.) On August 26, 2009, Nassan filed a motion to dismiss the initial complaint. (Docket No. 19.) That same day, defendants Heckman, Epstein, Pawlowski, and Seilhamer filed a motion to dismiss the initial complaint. (Docket No. 21.) On November 19, 2009, this court held a hearing on the two motions to dismiss. At the hearing, the court also addressed a motion to strike scandalous pleadings filed on September 1, 2009 by plaintiffs. (Docket No. 23.) On the record, the court denied the motion to strike and granted the motions to dismiss the complaint without prejudice. On December 3, 2009, plaintiffs filed the amended complaint, and the pending motion for sanctions and the motions to dismiss followed.

### *Allegations in the Amended Complaint[1]*

Plaintiffs' claims arise from the death of Nicholas Haniotakis. Zion is the appointed personal representative of the estate of Nicholas Haniotakis. (Am. Compl. (Docket No. 54) ¶ 2.) Taylor Haniotakis, Nikki Haniotakis, and Benjamin Haniotakis are the children of Nicholas Haniotakis. (Id. ¶ 3.) Zion filed the lawsuit in both her individual capacity and her representative capacity on behalf of the estate of Nicholas Haniotakis. (Id. ¶ 2.)

Nassan was a Pennsylvania State Police patrol trooper, stationed out of Troop B in

---

[1] Factual allegations raised in a complaint must be accepted as true for the purpose of deciding a motion to dismiss. See Vallies v. Sky Bank, 432 F.3d 493, 494 (3d Cir. 2006).

Fayette County, Pennsylvania. (Id. ¶ 4.) Donnelly was an officer employed by the Pittsburgh Police Department. (Id. ¶ 5.) Pawlowski was the Pennsylvania State Police Commissioner. (Id. ¶ 6.) As commissioner, Pawlowski exercised administrative command over the Pennsylvania State Police. (Id.) This command included fiscal authority and responsibility, as well responsibilities related to employee misconduct and discipline. (Id.) Seilhamer was the Area Commander responsible for supervising Troop B, among other troops. (Id. ¶ 7.) Epstein was the commanding officer of Troop B. (Id. ¶ 8.) Heckman was the station commander and direct supervisor of Nassan. (Id. ¶ 9.)

On the night of March 15, 2009, Nassan and Donnelly were working together, patrolling in a police vehicle. (Id. ¶ 5.) They followed a vehicle because it had a broken headlight. (Id. ¶ 10.) This vehicle was driven by Nicholas Haniotakis, although Nassan and Donnelly did not know the identity of the driver or the driver's condition, state of mind, or intentions. (Id. ¶¶ 10, 12.) Nassan and Donnelly were instructed by dispatch to stop their pursuit of the vehicle, but, despite the instructions, the two continued to follow the vehicle. (Id. ¶ 14.) Nicholas Haniotakis stopped the vehicle, and Nassan and Donnelly exited the police vehicle with firearms drawn. (Id. ¶ 15.) Nassan and Donnelly approached the vehicle and opened fire. (Id.) Nicholas Haniotakis was facing away from Nassan and Donnelly when the two fired. (Id. ¶ 19.) Bullets hit Nicholas Haniotakis in the extremities and back, which ultimately caused his death. (Id. ¶¶ 20, 21.)

Nicholas Haniotakis did not possess a weapon, and he did not pose a threat to anyone in the area. (Id. ¶¶ 16, 17.) Police officers are taught to use a police vehicle as a barrier if necessary for protection, and are also taught to maintain distance when pursuing individuals. (Id. ¶ 17.) Nassan and Donnelly could have used the police vehicle as a barrier, but did not do so. (Id. ¶ 18.)

Nassan had a history of violent propensities, including physical altercations with officers

while he was in the military.  (Id. ¶ 22.)  Heckman, Pawlowski, Epstein, and Seilhamer were aware of this history.  (Id. ¶ 42.)  In one such incident, Nassan caused facial fractures and head injuries to a military officer.  (Id.)  Nassan left the military without an honorable discharge.  (Id. ¶ 23.)  Nassan became employed by the Pennsylvania State Police after leaving the military.  (Id.)  The Pennsylvania State Police had Trooper Frank Murphy, who shared a close personal relationship with Nassan, perform Nassan's background check.  (Id.)  Murphy had a history of a violence and perjury, and intentionally covered up several aspects of Nassan's history.  (Id. ¶¶ 23, 24.)

During his employment as a state trooper, Nassan was involved in confrontations with both state and local law enforcement officers, including Barry Gaston of the Pennsylvania State Police and Corporal Tony Guy.  (Id. ¶¶ 25, 33.)  Nassan was not disciplined for these altercations, and his supervisors, including Pawlowski, Seilhamer, Epstein, and Heckman, were aware of the incidents.  (Id. ¶¶ 26-30, 33.)  Nassan also had confrontations with members of public.  (Id. ¶ 32.)

In February 2008, a civil jury found Nassan liable for violating the civil rights of Michael Ellerbe ("Ellerbe"), a twelve-year-old boy, and returned a $28,000,000 verdict against Nassan and his co-defendant.  (Id. ¶¶ 34, 37.)  The verdict was based upon the fatal shooting of Ellerbe by Nassan.  (Id.)  The boy was unarmed and running away when he was shot.  (Id. ¶ 36.)  Pawlowski interacted with the office of the governor of Pennsylvania with respect to the jury verdict and facilitated a settlement of the case.  (Id. ¶¶ 6, 38.)  Heckman was the crime unit commander responsible for investigating the shooting on behalf of the Pennsylvania State Police.  (Id. ¶¶ 9, 41.)

Pawlowski, Seilhamer, Epstein, and Heckman knew who Nassan was before the jury returned its verdict in the case related to Ellerbe.  (Id. ¶ 54.)  After the verdict, Pawlowski,

Seilhamer, Epstein, and Heckman learned through "lines of communication standard in the state police" that the jury determined Nassan lied about the circumstances of the shooting. (Id.) Around the time of the verdict, Pawlowski, Seilhamer, Epstein and Heckman each learned the significant points about Nassan's past. (Id. ¶ 55.) For example, plaintiffs allege Pawlowski, Seilhamer, Epstein, and Heckman learned that Nassan was asked to leave the military because Nassan failed to meet certain standards, and they learned that the military rejected Nassan's request to remain in the service of the military despite these failures. (Id.)

In December 2008, Heckman forced a subordinate, Corporal Ken Munshower ("Munshower"), to alter the employment records of Nassan, purging evidence of violent tendencies. (Id. ¶ 39.) With respect to an annual performance evaluation for Nassan, Heckman ordered Munshower to change a statement from "needed improvement" to "satisfactory." (Id. ¶ 40.)

Pawlowski, Seilhamer, Epstein, and Heckman received specific information and reports with respect to Nassan's propensity for violence, misconduct while on duty, record of physical confrontations with other state and local police officers and supervisors, and fatal shooting of Ellerbe. (Id. ¶¶ 6-9, 26-29.) Although Heckman, Pawlowski, Epstein, and Seilhamer were aware of violent episodes in Nassan's past, they did not order training to address these problems. (Id. ¶ 42.) Heckman, Pawlowski, Epstein, and Seilhamer decided to continue Nassan's employment, despite their being aware of Nassan's history. (Id. ¶ 43.)

Plaintiffs assert three counts in the amended complaint. Count one asserts a claim pursuant to 42 U.S.C. § 1983, alleging that Nassan or Donnelly used excessive deadly force on Nicholas Haniotakis, in violation of his Fourth Amendment rights. (Id. ¶¶ 45-51.) Count two asserts a claim pursuant to § 1983, alleging that Pawlowski, Seilhamer, Epstein, and Heckman violated Nicholas Haniotakis's civil rights by acting with deliberate indifference to, or tacit

authorization of, Nassan's illegal conduct.  (Id. ¶¶ 52-59.)  Count three asserts a state law claim

of assault and battery against Nassan.  (Id. ¶¶ 60-62.)  The court will first discuss the motions to

dismiss and then will consider the motion for sanctions.


## I. Motions to Dismiss

The motions to dismiss filed by Nassan and Donnelly challenge the factual allegations in

the amended complaint, arguing that they are insufficient to establish a § 1983 claim of excessive

force.  Nassan and Donnelly argue that they are entitled to qualified immunity.[2]

The motion to dismiss filed by supervisory defendants also challenges the factual

allegations.  Supervisory defendants argue that plaintiffs failed to plead sufficient facts to

establish their personal involvement in the violations of the constitutional rights of Nicholas

Haniotakis.


### A. Standard of Review with respect to Motions to Dismiss

A motion to dismiss tests the legal sufficiency of the complaint.  Kost v. Kozakiewicz, 1

F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on

whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to

dismiss, the court accepts as true all well-pled factual allegations in the complaint and views

them in a light most favorable to the plaintiff.  U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383,

388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") motion to dismiss, a complaint must

provide more than labels and conclusions.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555

---

[2] No argument is made in Nassan's motion to dismiss with respect to count III, a state law claim for assault against
Nassan.

(2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing

Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a

right to relief above the speculative level" and "sufficient to state a claim for relief that is

plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S.

at 556).

> The plausibility standard is not akin to a "probability requirement,"
> but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. . . . Where a complaint pleads facts that are
> "merely consistent with" a defendant's liability, it "stops short of
> the line between possibility and plausibility of 'entitlement to
> relief.'"

Id. at 1949 (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

Two working principles underlie Twombly. Id. First, with respect to mere conclusory

statements, a court need not accept as true all the allegations contained in a complaint.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555.) Second, to survive a motion

to dismiss, a claim must state a plausible claim for relief. Id. at 1950. "Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." Id. (citing Iqbal v .

Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)). "But where the well-pleaded facts do not permit

the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it

has not 'show[n] – that the pleader is entitled to relief.'" Id. (quoting FED. R. CIV. P. 8(a)(2)). A

court considering a motion to dismiss may begin by identifying pleadings that are not entitled to

the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id.

**B. Discussion with respect to Motions to Dismiss**

**1. Facts to consider in analyzing the motions to dismiss**

**a. Factual allegations versus legal elements and conclusions**

In ruling upon a motion to dismiss, a court must accept as true all well-pled factual allegations in the complaint. Iqbal, 129 S. Ct. at 1950. The court does not, however, have to accept the truth of "legal conclusions couched as factual allegations" or "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" Donnelly v. O'Malley & Langan, PC, No. 09-3910, 2010 WL 925869, at *2 (3d Cir. Mar. 16, 2010) (quoting Iqbal, 129 S. Ct. at 1949); see Mays v. Truppo, No. 09-4772, 2010 WL 715362, at **2-3 (D.N.J. Feb. 22, 2010) (noting that the first "working principle" set forth in Iqbal is that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

In Iqbal, the Supreme Court analyzed the allegations of the complaint to determine whether any were not entitled to an assumption of truth. The Supreme Court held that the allegation that the defendant "knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest" was "conclusory and not entitled to be assumed true." Iqbal, 129 S. Ct. at 1951.

This court finds that all conclusions in the complaint that Nicholas Haniotakis was not a

"threat of harm" to the police officers are not entitled to be accepted by this court, because there are insufficient factual allegations to support the conclusion. In <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1279-80 (11th Cir. 2002), the plaintiff's son was fatally shot by police officers moments after a high-speed automobile chase. <u>Id.</u> at 1276-78. The plaintiff sued, claiming that the use of deadly force violated her son's Fourth Amendment rights. The defendants moved for summary judgment. <u>Id.</u> at 1281. In response, the plaintiff argued that a statement in an affidavit of a witness, which provided "[a]t no time did the [plaintiff's] car appear to be a threat to any officer on the scene," created a an issue of material fact whether the plaintiff posed an immediate threat of serious physical harm to the defendants at the time the defendants shot the plaintiff. <u>Id.</u> at 1279-80. The district court agreed with plaintiff, but the Court of Appeals for the Eleventh Circuit held that this statement was not entitled to the court's acceptance, stating that the "conclusory opinion is inadequate to create an issue of fact about the objective danger . . . ." <u>Id.</u> at 1281. The court of appeals noted the statement was not supported by sufficient facts to be worthy of credence. <u>Id.</u> at 1280-81.

Although <u>Pace</u> was decided upon a motion for summary judgment, the court believes the same principles would apply given that the statement in <u>Pace</u> was virtually identical to the allegations presented in the amended complaint here. Without sufficient factual allegations to support such conclusions in plaintiffs' amended complaint, the court cannot accept the conclusions for purposes of analyzing the pending motions to dismiss.

To the extent that supervisory defendants contend that a number of factual allegations in the amended complaint should be re-characterized as legal conclusions not worthy of credence under <u>Iqbal</u>, the court will address those contentions when discussing supervisory defendants' motion to dismiss.

### b. Matters of public record

In ruling upon a motion to dismiss, a district court generally is "not permitted to go beyond the facts alleged in the [c]omplaint." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424-25 (3d Cir. 1997). Despite the general rule that a district court is limited to the four corners of a complaint in analyzing a motion to dismiss filed pursuant Rule 12(b)(6), a district court may look beyond the complaint and address the motion as one requesting summary judgment. A district court has "discretion to address evidence outside the complaint when ruling on a motion to dismiss." Pryor v. NCAA, 288 F.3d 548, 559 (3d Cir. 2006). "The court is not permitted to look at matters outside the record; if such matters are considered, the [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss is, by the express terms of [Federal Rule of Civil Procedure] 12(b), converted into a motion for summary judgment." Id. at 560. Certain limited types of evidence, however, may be considered by a district court upon a Rule 12(b)(6) motion to dismiss without converting the motion to dismiss into a motion for summary judgment. The court may take judicial notice of matters of public record without effecting such a conversion. Anspach ex rel. Anspach v. City of Phila., 503 F.3d 256, 273 n.11 (3d Cir. 2007). Matters of public record that the court may take judicial notice of are those facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2); see Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

Nassan attached seven exhibits to his motion to dismiss the original complaint. (See Docket No. 20, Exs. A-G.) These exhibits are alleged to be matters of public record. (See Mot. to Dismiss Hr'g Tr. (Docket No. 82) 27-30, Nov. 19, 2009.) Among these exhibits are a criminal complaint filed in 2005 against Nicholas Haniotakis in an unrelated case. (Docket No. 20, Ex. D). That complaint concerned the alleged use by Nicholas Haniotakis of a vehicle to assault a police officer. (Id.) An autopsy report and other records from the Allegheny County Office of

the Medical Examiner related to the death of Nicholas Haniotakis (id., Ex. E), and petitions for protection from abuse (id., Exs. F, G) were also attached as exhibits.

From the public records attached to Nassan's motion to dismiss the original complaint, defendants wish the court to infer the aggressive or reckless use of the automobile by Nicholas Haniotakis immediately prior to the shooting. (See Mot. to Dismiss Hr'g Tr. 27-54.) Based upon this inference, defendants argue that the court should apply Fourth Amendment jurisprudence specific to situations involving reckless driving. (Id.)

The court cannot draw the suggested inference in this case. The only records that directly or indirectly concern the actions of Nicholas Haniotakis on the night of his death are the Allegheny County Office of the Medical Examiner records. (Docket No. 20, Ex. E.) These records include the results of forensic tests which indicate Nicholas Haniotakis had alcohol and other drugs in his system on the night of the incident.[3] (Id.) Such evidence, however, does not establish as a matter of law that Nicholas Haniotakis was operating his vehicle in an aggressive or reckless manner at the time of his death. Based upon the factual allegations of the amended complaint, Nicholas Haniotakis could not have been operating his vehicle in a reckless manner during the moments preceding his death; rather, after the chase, his vehicle was stopped. See Boring v. Google, Inc., No. 09-2350, 2010 WL 318281, at *2 (3d Cir. Jan. 28, 2010) (noting that, although Iqbal provides that legal conclusions do not have to be accepted as true, the court "must accept the truth of all factual allegations in the complaint and *must draw all reasonable inferences in favor of the non-movant*" (emphasis added)). The complaint contains allegations

---

[3] The Pennsylvania Coroner's Act provides "[e]very coroner, within thirty (30) days after the end of each year, shall deposit all of his official records and papers for the preceding year in the office of the prothonotary for the inspection of all persons interested therein." 16 PA. CONS. STAT. § 1251. The court could not find any decisions where a court applying Pennsylvania law took judicial notice of coroner or medical examiner records, but courts applying the law of other jurisdictions took such notice of autopsy records. See, e.g., People v. Garrett, 339 N.E.2d 753, 759 (Ill. 1975) (taking judicial notice of coroner's report under Illinois law); Snyder v. Enterprise Rent-A-Car Co., 392 F. Supp. 2d 1116, 1120 (N.D. Cal. 2005) (taking judicial notice of coroner's report under California law).

that the shooting occurred after the vehicular chase ended and after the area was or could have been secured from danger.  The probative value of the Medical Examiner's toxicology reports, therefore, is questionable at this stage.[4]

## 2. Count I

### a. Failure to state a claim that Nicholas Haniotakis's Fourth Amendment rights were violated

In count one, plaintiffs assert a claim pursuant to § 1983 against Nassan and Donnelly, alleging that they used excessive deadly force on Nicholas Haniotakis in violation of the Fourth Amendment.  (Am. Compl. ¶¶ 45-51.)  Section 1983 provides a remedy against any person who, under the color of state law, deprives another of his or her constitutional rights.  A prima facie case under § 1983 requires a plaintiff to demonstrate that a person deprived him or her of a federal right and that the person who deprived him or her of that right acted under color of state or territorial law.  Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  The parties did not make any arguments with respect to whether defendants acted under color of state law; rather, Nassan and Donnelly moved to dismiss count one of the amended complaint on the ground that, even if plaintiffs' factual allegations with respect to the § 1983 claims are true, they did not deprive Nicholas Haniotakis of his constitutional rights as a matter of law.

Claims of excessive force are analyzed under the Fourth Amendment.  Rodriguez v. Passaic, 730 F. Supp. 1314, 1320 (D.N.J. 1990).  "'[A]ll claims that law enforcement officers

---

[4] In addition to the exhibits attached to Nassan's motion to dismiss, exhibits are attached to the motion for sanctions filed by Nassan.  These exhibits include a March 15, 2009 City of Pittsburgh Police press release (Docket No. 63, Ex. 1), reports and statements that came from television station WTAE (id., Exs. 2, 4), and photographs from the night of the incident allegedly depicting the damage created by the reckless driving of Nicholas Haniotakis (id., Exs. 6-20).  Nassan acknowledges that, although the court may consider evidence outside of the pleadings in analyzing a motion for sanctions, the court should not consider such evidence in analyzing a motion to dismiss.  (See Br. in Supp. of Mot. for Sanctions (Docket No. 64) at 3 n.1 (citing Chien v. Skytar Bio Pharma. Co., 256 F.R.D. 67, 69 (D. Conn. 2009)).)  The court will not consider these exhibits in ruling upon the motions to dismiss, since their consideration would convert the motions to dismiss into motions for summary judgment.

have used excessive force – deadly or not – in the course of an arrest, investigation stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" <u>In re City of Phila. Litig.</u>, 49 F.3d 945, 962 (3d Cir. 1995) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)). Therefore, plaintiffs' claims here will be analyzed under the Fourth Amendment standard.

A claim for excessive force must involve a "seizure" that was unreasonable. <u>Kopec v. Tate</u>, 361 F.3d 772, 776 (3d Cir. 2004). "[A] suspect is not seized until he submits to the police's authority or the police subject him to some degree of physical force." <u>Abraham v. Raso</u>, 183 F.3d 279, 291 (3d Cir. 1999). A person is "seized" when he is shot. <u>Abraham</u>, 183 F.3d at 288; <u>see</u> <u>Tennessee v. Garner</u>, 471 U.S.1, 7 (1985) ("apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").

The reasonableness standard under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396. "Other factors include 'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" <u>Couden v. Duffy</u>, 446 F.3d 483, 497 (3d Cir. 2006) (quoting <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822 (3d Cir. 1997)).

The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396. The reasonableness finding should allow

> for the fact that police officers are often forced to make split-
> second judgments–in circumstances that are tense, uncertain, and

> rapidly evolving–about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation.

Id. at 397. There is no "easy-to-apply legal test in the Fourth Amendment context" and "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" Scott v. Harris, 550 U.S. 372, 383 (2007).

The court must determine at this stage of the pleadings whether the complaint shows that Nassan and Donnelly acted in an objectively reasonable manner in light of the circumstances. In making this determination, the court must assume the veracity of the factual allegations of the complaint. Iqbal, 129 S. Ct. at 1950; see Banks v. Gammon, No. 3:08-CV-0474, 2010 WL 996743, at *7 (N.D. Tex. Jan. 26, 2010) ("When qualified immunity is raised in a motion to dismiss, it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'" (internal quotation omitted)).[5]

Analyzing the factual allegations under the factors detailed in Graham, the amended complaint is sufficient to survive a motion to dismiss for failure to state a claim. With respect to the severity of the incident at issue, the allegations are that Nassan and Donnelly began following the vehicle driven by Nicholas Haniotakis because it had a broken headlight. Prior to the chase, Nassan and Donnelly did not observe Nicholas Haniotakis commit a felony or crime. Nassan and

---

[5] The analysis of qualified immunity is intertwined here with the question whether an officer used excessive force. See Saucier v. Katz, 533 U.S. 194, 197 (2001) (upon a motion for summary judgment, examining the interplay between "qualified immunity and constitutional violation issues," and holding that, although related, the qualified immunity analysis requires additional considerations) (overruled on other grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009)). At the motion to dismiss stage, both matters consider whether the allegations of the complaint are sufficient to raise a constitutional violation. See Rakun v. Kendall County, No. 06-CV-1044, 2007 WL 2815571, at *17 (W.D. Tex. Sept. 24, 2007) ("in the context of a motion to dismiss based on qualified immunity, . . . the Plaintiff must demonstrate facts that establish the elements of the constitutional violation").

Donnelly possessed no information about the driver of the vehicle, and they did not know the driver's state of mind or condition. Nicholas Haniotakis did not possess a weapon or gun. After Nicholas Haniotakis stopped the vehicle, Nassan and Donnelly had the opportunity to set up a barrier between Nicholas Haniotakis and themselves. See Ougel v. Amite City Police Dep't, 352 F. App'x 941, 944 (5th Cir. 2009) (affirming the denial of summary judgment with respect to the issue of qualified immunity, because, even though the defendant stole an automobile and led police on a high speed chase, a fact finder could determine an officer's use of deadly force by firing and killing the defendant was unreasonable under the circumstances since there was evidence the defendant was partially restrained and no longer a threat). Nassan and Donnelly did not do so and proceeded toward the vehicle with their weapons drawn. As they approached, they fired their guns in the direction of the vehicle and shot Nicholas Haniotakis in his extremities and back. There are no allegations with respect to whether the officers were effecting an arrest or whether Nicholas Haniotakis was resisting arrest at the time he was shot. Nicholas Haniotakis was by himself at the time of the incident. See Ukofia v. Dep't of Homeland Sec., No. 09-0017, 2010 WL 597059, at *11 (D. Minn. Feb. 17, 2010) (upon a motion to dismiss, analyzing similar reasonableness factors in determining that the factual allegations of the complaint established that the defendants violated Fourth Amendment rights).

At oral argument, counsel for Nassan argued that the Fourth Amendment reasonableness principles set forth in Graham and Garner are general standards that have been further refined with respect to situations involving vehicular chases. Counsel for Nassan cited Scott v. Harris, 550 U.S. 372 (2007), and other decisions that involved reckless driving. Defendants argue the factual circumstances in the cited decisions are similar to those presented in this case, and thus the Fourth Amendment case law of those decisions should apply here. For the reasons already explained, however, the court cannot infer based upon the complaint that Nicholas Haniotakis at

the time he was shot was operating his vehicle in a reckless manner for purposes of the current motions to dismiss. The factual circumstances presented here for purposes of deciding Nassan's motion are not analogous to those presented in Scott and similar cases.

Even assuming Nicholas Haniotakis was operating his vehicle recklessly during the chase, the court cannot grant dismissal at this time. According to the factual allegations, the chase was over and Nicholas Haniotakis's vehicle was stopped, for whatever reason, prior to the shooting. Law enforcement officers do not have carte blanche to open fire on a person merely because that person previously led the officers on a dangerous, high-speed chase. See Banks, 2010 WL 996743, at *7 ("[T]he issue of excessive force is greatly dependent on the facts of the particular case. Use of deadly force is not justified in all cases in which a person was or had been fleeing in a vehicle.") For example, in Ougel v. Amite City Police Department, an individual stole an automobile from a Porsche dealership and led the police on a multi-state high-speed chase. The police eventually surrounded the individual with vehicles and forced him to stop his automobile. Ougel, 352 F. App'x at 942. After the individual was stopped, one officer reached into the individual's automobile, put him in a wristlock, and tried to remove him from the vehicle, while two other officers positioned themselves in front of the vehicle with weapons drawn. Id. at 942-43. The officers ordered the individual to show his hands. Id. at 943. The parties disputed what happened after that point, but the individual was fatally shot. The plaintiffs adduced evidence that the individual's right arm was raised in the air when he was shot and the shot was fired from three to six inches away. The trial court denied a motion for summary judgment, and the Court of Appeals for the Fifth Circuit affirmed. The court of appeals stated that "[f]iring a shot at an unarmed suspect whose left arm was restrained by a wrist lock and whose right arm was in the air would constitute an objectively unreasonable exercise of excessive force because the suspect would at that point not present a danger to the officers

present."  Id. at 944.

Here, even assuming a reckless chase occurred, the factual allegations, viewed in

plaintiffs' favor, establish that Nassan and Donnelly used deadly force to seize Nicholas

Haniotakis under circumstances where it was unreasonable to use such force.  Nicholas

Haniotakis stopped his vehicle and police officers had the ability to set up a barrier prior to

opening fire upon him.  The officers shot Nicholas Haniotakis in the back.[6]  At this stage there

are no factual allegations that would justify the use of deadly force in this situation, and the

amended complaint adequately asserts actions of force on the part of Nassan and Donnelly that,

in accordance with the principles set forth in Graham, were unreasonable under the

circumstances alleged.

Defendants argue that Iqbal requires that the court evaluate the complaint with a "more

discerning eye."  (Docket No. 73 at 5.)  In Iqbal, the Supreme Court concluded that, in the

specific context of a Bivens action,[7] pleading facts that were consistent with both the existence

and nonexistence of a constitutional violation did not entitle the plaintiff to survive a motion to

---

[6]Although "there is no obvious way to quantify the risks on either side," the analysis whether the force used was
reasonable requires consideration of those risks.  Scott, 550 U.S. at 383.  Part of the analysis focuses upon the type
of forced used and the risk posed by that force.  For example, discharging a firearm aimed at the victim's head poses
a greater risk of severe injury than discharging a firearm aimed at the victim's extremities.  And using a firearm to
subdue a dangerous individual poses a greater risk than trying to subdue that individual without a weapon.  See id. at
383-84.  Another part of the analysis focuses upon the risk posed to the public or the law enforcement officials.  For
example, law enforcement officials may use a relatively serious level of force against an individual that demonstrates
"he would do almost anything to avoid capture," including endangering others.  Brosseau v. Haugen, 543 U.S. 194,
200 (2004).  In accordance with these principles, the Supreme Court held that using a ramming technique during the
course of a high-speed automobile chase was not an unreasonable use of force, Scott, 550 U.S. at 383-84, nor was
the firing of a gun unreasonable when, after a chase on foot and the officer positioned herself partially inside a car's
driver side window, the officer fired as the car's engine started and the car began to move, Brosseau, 543 U.S. at
194-200.  Even though an automobile can be used as a deadly weapon to injure others, at the point Nicholas
Haniotakis stopped his vehicle, the threat posed by Nicholas Haniotakis was lessened, since a stopped vehicle is less
dangerous than one moving at a high speed.  There are no allegations with respect to whether the engine was running
after Nicholas Haniotakis stopped the vehicle or whether he maintained a position from which he could operate the
vehicle, and there are no allegations that Nassan, Donnelly, or others were in positions in which they could have
been injured if Nicholas Haniotakis suddenly stepped on the accelerator.
[7] In Bivens v. Six Unknown Named Federal Narcotics Agents, 403 U.S. 388, 389 (1971), the Supreme Court
recognized an implied civil rights claim for an individual subject to an unreasonable search or seizure by a federal
agent.  Bivens actions are the "federal counterpart[s]" to § 1983 actions, and the same standards apply.  Paton v. La
Prade, 524 F.2d 862, 871 (3d Cir. 1975).

dismiss and proceed to the discovery process.  Iqbal, 129 S. Ct. at 1951-52.  Although plaintiffs

only assert a few factual allegations in the amended complaint with respect to the circumstances

leading up to and surrounding the death of Nicholas Haniotakis, Iqbal does not impose a

numerosity requirement, and the court finds the factual allegations sufficient under the standards

set forth in Iqbal.  Accepting the truth of those allegations, they establish a plausible claim that

the Fourth Amendment rights of Nicholas Haniotakis were violated.  Defendants have fair notice

of what claims they must defend for purposes of this litigation.

### b. Qualified immunity

In addition to moving to dismiss on the grounds that there are no genuine issues of

material fact with respect to the § 1983 excessive force claims, Nassan and Donnelly argue that

they are entitled to qualified immunity with respect to those claims.

The privilege of qualified immunity recognizes the balance between the need for a forum

to vindicate the abuse of federal rights and the "substantial societal costs" entailed in opening

government officials to suit for the discretionary exercise of their public duties.  Harlow v.

Fitzgerald, 457 U.S. 800, 814 (1982).  The United States Supreme Court resolved these

competing concerns "by generally providing government officials performing discretionary

functions with a qualified immunity, shielding them from civil damages liability as long as their

actions could reasonably have been thought consistent with the rights they are alleged to have

violated." Anderson v. Creighton, 483 U.S. 632, 638 (1987).[8]  In the context of Fourth

Amendment excessive force cases, "[q]ualified immunity operates . . . to protect officers from

the sometimes 'hazy border between excessive and acceptable force,' Priester v. Riviera Beach,

[208 F.3d 919, 926-27 (11th Cir. 2000)], and to ensure that before they are subjected to suit,

---

[8] The United States Court of Appeals for the Third Circuit recognized "that there is a compelling need for such
protective doctrine because of the severe chilling effect numerous suits for damages would have on prospective

officers are on notice their conduct is unlawful." Saucier, 533 U.S. at 206. The privilege affords "protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

To determine whether a government official is entitled to qualified immunity, the court must "decide 'whether a constitutional right would have been violated on the facts alleged.'" Doe v. Groody, 361 F.3d 232, 237 (3d Cir. 2004)) (quoting Saucier, 533 U.S. at 200). The court already determined that, when accepting as true the facts alleged by plaintiffs in the present case, plaintiffs' amended complaint sets forth a plausible claim for a violation of the constitutional rights of Nicholas Haniotakis. The next step in the qualified immunity analysis requires the court to "consider whether the right was clearly established." McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006) (quoting Saucier, 533 U.S. at 201). If the court answers "yes" to both questions, then the defendants are not entitled to qualified immunity. See McKee, 436 F.3d at 169.

When qualified immunity attaches, the privilege "is an *immunity from suit* rather than a mere defense to liability," which is lost if defendants are permitted to go to trial. Saucier, 533 U.S. at 200-01; Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (qualified immunity is not a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation"). Consequently, the Supreme Court has often stressed the importance of resolving qualified immunity issues at the earliest possible stage in litigation. Saucier, 533 U.S. at 201 (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

At oral argument, counsel for Nassan argued that the motion to dismiss should be granted on the basis of qualified immunity, because, in the context of § 1983 unreasonable force claims arising from dangerous vehicular chases brought against law enforcement officials, it has never been held that the use of force was unreasonable. Given this lack of precedent, counsel for

officials." Acierno v. Cloutier, 40 F.3d 597, 615 (3d Cir. 1994).

Nassan argued that plaintiffs' alleged constitutional violations were not clearly established. The court need not reach this issue at this stage, however, since the court already determined that it cannot infer at this stage of the pleadings that Nicholas Haniotakis was operating his vehicle in a reckless manner at the time he was shot.

It is clearly established that if a individual does not present a danger to the officers present or others, law enforcement officials violate that individual's Fourth Amendment rights by shooting the him or her with a firearm. See Garner, 471 U.S. at 11. When the factual allegations in this case are viewed in plaintiffs' favor, one can reasonably infer that Nicholas Haniotakis did not present a danger immediately prior to the fatal shot. Under those circumstances, the complaint is sufficient for the court to find a plausible claim that the actions of Nassan and Donnelly violated Nicholas Haniotakis's clearly established Fourth Amendment right to be free from the use of unreasonable force.

Although defendants are not entitled to qualified immunity at this juncture, defendants raised another related issue. Defendants argue that plaintiffs drafted the complaint in a manner to prevent the court from engaging in a robust qualified immunity analysis at this stage. Defendants believe that there exist facts not included in the allegations of the complaint that would change the court's qualified immunity analysis. In support of this argument, defendants cite Thomas v. Independence Township, 463 F.3d 285 (3d Cir. 2006).

In Thomas, the plaintiffs brought claims, inter alia, pursuant to § 1983 alleging deprivations of equal protection, due process, free speech and political association, and unreasonable search and seizure. The defendants moved to dismiss, arguing that qualified immunity applied. After explaining the general qualified immunity standard, the Court of Appeals for the Third Circuit emphasized that the qualified immunity defense, when applicable, should act to prevent a party from facing the burdens of litigation, including discovery:

> Because qualified immunity bestows immunity from suit, the
> Supreme Court "repeatedly ha[s] stressed the importance of
> resolving immunity questions at the earliest possible stage in
> litigation." [Hunter v. Bryant, 502 U.S. 224, 227 (1991)]. The
> Supreme Court has admonished that "[u]ntil this threshold
> immunity question is resolved, discovery should not be allowed."
> [Harlow, 457 U.S. at 818]. Thus, "[u]nless the plaintiff's
> allegations state a claim of violation of clearly established law, a
> defendant pleading qualified immunity is entitled to dismissal
> before the commencement of discovery." [Mitchell, 472 U.S. at
> 526].

Id. at 291. Because the qualified immunity analysis should take place before discovery, the defendants argued for a heightened pleading standard when immunity is at issue. The defendants stressed "that plaintiffs should not be allowed to survive a qualified immunity defense at the motion to dismiss stage by crafting a complaint so lacking in factual detail that it effectively avoids a qualified immunity analysis." Id. The court of appeals stated that this argument, "[w]hile facially appealing, . . . ultimately lacks merit because it conflates qualified immunity with the merits of a plaintiff's cause of action under § 1983." Id. at 292. The court of appeals explained that there was no heightened pleading requirement for qualified immunity issues under Supreme Court precedent. Id. at 292-93 (citing Gomez v. Toledo, 446 U.S. 635, 635-36 (1980) and Crawford-El v. Britton, 523 U.S. 574, 595 (1998)). "[T]he burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff." Id. at 293. The court of appeals concluded "that a plaintiff has no obligation to plead a violation of clearly established law in order to avoid dismissal on qualified immunity grounds." Id.

The Court of Appeals for the Third Circuit analyzed the allegations of the complaint, and determined that the factual allegations were sufficient when taken in the light most favorable to the plaintiffs. Id. at 295-99. After determining that the majority of the claims were adequately asserted, the court ruled that, with a few exceptions, "the Individual Defendants are not entitled to dismissal on qualified immunity grounds and/or for failure to state a claim for relief." Id. at

299.

The court of appeals did not, however, end its inquiry there. The court addressed the

"inherent tension between federal qualified immunity jurisprudence and the concept of notice

pleading." Id. The court of appeals stated:

> This case, perhaps better than any other, illustrates the incompatibility between the concept of notice pleading and the qualified immunity doctrine, and the resulting quandary faced by defendants pleading the defense. Here, plaintiffs have crafted a complaint lacking in detailed factual allegations. While the complaint complies with the simplified notice pleading standard of the Federal Rules, which itself is a close call, it clearly does not provide good fodder for the framing of a qualified immunity defense. The District Court, in turn, was unable to engage in a meaningful fact-specific qualified immunity analysis, and, therefore, denied qualified immunity "without prejudice to [defendants'] right to raise their arguments again, under Federal Rule of Civil Procedure 56, after the factual record was more fully developed." (App. at 9.) As a result, the Individual Defendants who may be immune from suit must engage in discovery and succumb to the other burdens of litigation, all the while forgoing the very protections afforded by qualified immunity.

> Unsurprisingly, plaintiffs insist that their complaint *is* amenable to a qualified immunity analysis. They posit that it is clearly established that it is unlawful to harass and intimidate a person based upon his or her race; to conduct searches and seizures of a person without a warrant or probable cause; and to use excessive force against a person in an effort to harass and intimidate. (Response Brief 7-10.) However, these are the kinds of broad propositions of law that cannot guide a court in determining whether a constitutional right is clearly established. If such broad propositions of law were sufficient for purposes of the qualified immunity analysis, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, [483 U.S. 635, 639, (1987)]. Moreover, "Harlow would be transformed from a guarantee of immunity into a rule of pleading." Id.

Id. at 299-300. The alleged constitutional violations were pled at a "level of abstraction" that

caused the qualified immunity analysis to fail "in its purpose to protect government officials who

are immune from the burdens of discovery." Id. at 300.

The Court of Appeals for the Third Circuit observed that the district court could take one of several actions to address this issue:

> When presented with a complaint that does not lend itself to an early resolution of the qualified immunity issue, a district court has several options. First, a district court may order the plaintiff to reply to the defendant's answer pleading qualified immunity. Crawford-El, [523 U.S. at 598]. Second, a district court may grant a defense motion for a more definite statement under Rule 12(e) with respect to the conduct of which the plaintiff complains. Id. The district court should avail itself of these options before addressing the immunity question, which sometimes requires complicated analysis of legal issues. Id. If the plaintiff's action survives these hurdles, the plaintiff ordinarily will be entitled to some discovery, but the district court may limit the timing, sequence, frequency, and extent of that discovery under Rule 26. Id. [at 598-99]. Beyond these procedural tools, summary judgment remains a useful tool for precluding insubstantial claims from proceeding to trial. Id. [at 600].

Id. at 301. The court of appeals remanded the case "to the District Court with instructions to order plaintiffs to file a more definite statement under Rule 12(e) so that the Individual Defendants may reassert, and the District Court may reconsider, the qualified immunity issue in light of the factual context of this case." Id. at 299. The court of appeals instructed the district court to hold the motion to dismiss in abeyance pending the resolution of the motion for a more definite statement. Id. at 302.

Although the Thomas decision dealt with the notice pleading standard that has since been abrogated by the Supreme Court in Iqbal, the court does not find that the pleading requirements of Iqbal affect the general holdings of Thomas. Even in applying the Iqbal standard, the Court of Appeals for the Third Circuit has warned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Newland v. Reehorst, 328 F. App'x 788, 791 n.3 (3d Cir. 2009). In Debrew

v. Auman, 354 F. App'x 639, 642 (3d Cir. 2009), the Court of Appeals for the Third Circuit

vacated an order granting a motion to dismiss on qualified immunity grounds.  It stated that the

complaint lacked "more detailed allegations of facts about the events that prompted" the

defendants' unconstitutional actions, but recognized that, "[b]ecause the complaint failed to

disclose whether the defendants' actions did not violate a clearly established constitutional right,

dismissal on qualified immunity grounds was premature." Id. at 642 (citing Thomas, 463 F.3d at

291).  Following the logic of the Debrew decision, this court cannot grant defendants' motions to

dismiss on the basis of qualified immunity, since the immunity cannot be established from the

allegations on the face of the amended complaint.

    The "tension" that existed between the notice pleading standard and the qualified

immunity defense still exists even after Iqbal, as this case demonstrates.  Plaintiffs' allegations of

constitutional violations are sufficient under the requirements of Iqbal, but, according to

defendants, those allegations are not sufficient for the court to perform a fair analysis of the

qualified immunity defense – an analysis that gives the defense the opportunity to provide the

protection that the defense is supposed to afford.  Cf. Banks, 2010 WL 996743, at *7 (facing a

similar dilemma under the Iqbal standard, and denying a motion to dismiss where the defendant

argued qualified immunity for shooting the plaintiff after the plaintiff tried to evade a traffic

stop).

    Under the rationale of Thomas, this court must provide the appropriate protections

guaranteed by the qualified immunity defense.  Thomas, 463 F.3d at 300.  "[T]he trial court must

exercise its discretion in a way that protects the substance of the qualified immunity defense.  It

must exercise its discretion so that officials are not subjected to unnecessary and burdensome

discovery or trial proceedings." Crawford-El, 523 U.S. at 597-98.  The court previously

dismissed the initial complaint and permitted plaintiffs to file an amended complaint to assert

factual allegations in greater detail. Plaintiffs are not required to alleged facts that totally negate the qualified immunity defense, and requiring the plaintiffs to file a more definite statement pursuant to Rule 12(e) would unlikely resolve the issues posed in this case. Under those circumstances, this court will not order a more definite statement as the Court of Appeals for the Third Circuit instructed in <u>Thomas</u>. As explained in <u>Thomas</u>, however, this court "may order the plaintiff[s] to reply to the defendant[s'] answer pleading qualified immunity." <u>Thomas</u>, 463 F.3d at 301. Federal Rule of Civil Procedure 7(a)(7) provides that one of the pleadings allowed in federal court is a reply to an answer, if ordered by the court. FED. R. CIV. P. 7(a)(7) ("Only these pleadings are allowed: . . . if the court orders one, a reply to an answer.").

The court orders that defendants shall file answers by August 13, 2010. It is further ordered that, within twenty-one days of the filing of the answers, plaintiffs must reply to the answers. This ruling is without prejudice to defendants' ability to file motions for judgment on the pleadings with respect to qualified immunity after plaintiffs reply to the answer. If the issue of qualified immunity cannot be resolved at that time, then it may be addressed again upon a motion for summary judgment.

### 3. Count II

Supervisory defendants moved to dismiss count II of the amended complaint. Supervisory defendants attack the sufficiency of the factual allegations raised in the amended complaint that relate to the claims against them, and they argue that the amended complaint fails to allege their personal involvement in the alleged constitutional wrongs committed against Nicholas Haniotakis.

#### a. Factual allegations with respect to supervisory defendants

Supervisory defendants argue that plaintiffs failed to plead adequately constitutional claims against them under the <u>Iqbal</u> standard. In making this argument, supervisory defendants

contend that a number of factual allegations in the amended complaint should be recharacterized as legal conclusions not worthy of credence under Iqbal.

With respect to factual allegations in the amended complaint concerning the case of Ellerbe, supervisory defendants explain that the case was settled prior to litigating post-trial motions. The settlement did not provide for any party to admit to wrongdoing or liability. Supervisory defendants note that both the Pennsylvania State Police and the local District Attorney's Office conducted an investigation and cleared Nassan of wrongdoing. Supervisory defendants point out that "[a] civil jury's verdict, regardless of what side it favors, is not the absolute truth of what actually occurred in the case," and argue "[i]t is pure folly to contend as Plaintiff does that a civil jury's verdict somehow represents the conclusive final word on a matter and must be taken as gospel truth." (Supervisory Defs.' Br. in Supp. of Mot. to Dismiss (Docket No. 74) at 6.) Supervisory defendants argue that the factual allegations related to the Ellerbe case are conclusory.

In particular, supervisory defendants attacked the allegations that they:

> "*were aware of, monitored and participated in* the defense of Trooper Nassan for his deliberate violation of the civil rights of a 12 year old boy by fatally shooting him in the back, despite the fact that the young boy was unarmed and running away," (Am. Compl. ¶ 35 (emphasis added));

> "learned *through lines of communication standard in the state police* that Nassan, according to the jury, lied about the circumstances of his shot to the back of Michael Ellerbe," (id. ¶ 54 (emphasis added));

> "*received specific information and/or reports*" regarding physical altercations involving Nassan and misconduct committed by Nassan (id. ¶¶ 6-8, 26-29 (emphasis added)); and

> were made aware of altercations involving Nassan, because knowledge of these episodes "*went up the chain of command*, including the Commissioner's Office," (id. ¶ 33 (emphasis added)).

While a close question, the court does not find these factual allegations to be legal conclusions "couched as" factual allegations. Iqbal, 129 S. Ct. at 1950. Thus, the court will not disregard them. On the other hand, to the extent that supervisory defendants argue these factual allegations should be given little weight because of their vague nature, the court agrees that the allegations are relatively abstract. Plaintiffs do not allege facts with respect to how supervisory defendants monitored and participated in Nassan's defense in the earlier litigation, with the exception of Pawlowski's involvement in the settlement. Plaintiffs fail to identify the lines of communication used by the Pennsylvania State Police. The court will bear in mind the abstract nature of these factual allegations in evaluating count II of the amended complaint under the Iqbal standard.

### b. Personal involvement

Count II asserts claims against Pawlowski, Seilhamer, Epstein, and Heckman, alleging that supervisory defendants knew Nassan previously engaged in behavior harmful to the public and posed an ongoing danger. Plaintiffs allege that, despite this knowledge, supervisory defendants acted with deliberate indifference to the danger he presented. Plaintiffs assert that there is a causal connection between the indifference of supervisory defendants and the harm suffered by plaintiffs.

As already noted, supervisory defendants argue that plaintiffs fail to state plausible claims for relief under the requirements pronounced in Iqbal. In order to state valid claims at this stage, plaintiffs must allege sufficient facts that, when take as true, show there is a plausible claim. Iqbal, 129 S. Ct. at 1950.

In order to establish liability against a supervisory official, a plaintiff may not base a § 1983 action solely upon a theory of respondeat superior. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). A plaintiff, however, may allege facts indicating that a supervisory official

had personal involvement in the alleged wrongs, by showing "allegations of personal direction or of actual knowledge and acquiescence." Id. A supervisor's failure "properly to train, discipline or control" can only form the basis for § 1983 liability "if the supervisor (1) either knew contemporaneously of the subordinate's offending behavior or knew of prior pattern of similar incidents or circumstances and (2) acted in a manner that reasonably could be found to communicate a message of approval to the subordinate." Brown v. Byrd, No. 00-3118, 2000 WL 1780234, at *6 (E.D. Pa. Dec.1, 2000) (citing Montgomery v. De Simone, 159 F.3d 120, 126-27 (3d Cir. 1998)).

Here, for the reasons explained above, plaintiffs' factual allegations in the amended complaint are adequate to establish that Nassan violated the constitutional rights of Nicholas Haniotakis. With respect to supervisory defendants, plaintiffs alleged that supervisory defendants were aware of a prior pattern of aggressive and violent behavior on the part of Nassan, including the incident that resulted in the death of Ellerbe. Heckman was involved in the Pennsylvania State Police's investigation of that incident, and Pawlowski was involved with the settlement of the lawsuit. Although plaintiffs do not detail how exactly Seilhamer and Epstein were aware of Nassan's role in Ellerbe's death and supervisors cannot be deemed to have constructive knowledge of a subordinate's unconstitutional behavior solely by virtue of a supervisory position, McQueen v. Phila. Hous. Auth., No. 02-8941, 2003 WL 22533726, at *3 (E.D. Pa. Sept. 26, 2003), plaintiffs nonetheless alleged facts from which one could reasonably infer that Seilhamer and Epstein had the requisite knowledge. See Andrews v. City of Phila., 895 F.2d 1469, 1479 (3d Cir. 1990) ("There is evidence that [the supervisor] was aware of the problems . . . but did nothing to stop them. *The [incidences of unconstitutional conduct] were so offensive and regular that they could not have gone unnoticed* by the man who was ultimately responsible for the conduct of the Division." (emphasis added)). An incident as noteworthy as an

employee killing a person, regardless whether an internal investigation determined that the employee's actions were justified, could not have been ignored by the supervisors with authority over that employee. Supervisors with such authority would include Pawlowski, Seilhamer, Epstein, and Heckman. Plaintiffs allege that supervisory defendants received information and reports regarding prior physical altercations involving Nassan and misconduct on the part of Nassan.

The complaint alleges that (1) Pawlowski had authority over employee misconduct and discipline; (2) Heckman forced a subordinate to alter Nassan's employment records; (3) Pawlowski, Seilhamer, Epstein, and Heckman contributed to the decision to retain Nassan as a state trooper; and (4) Pawlowski, Seilhamer, Epstein, and Heckman failed to order appropriate training to address Nassan's alleged checkered past. Based upon the allegations of the complaint, supervisory defendants' actions can reasonably be construed as a message of approval of Nassan's conduct. While a close question, the court concludes that plaintiffs alleged sufficient facts that if proven and believed could establish supervisory defendants knew of a prior pattern of incidents involving Nassan. Thus, despite the limitations of the facts alleged in the amended complaint, the court finds that the amended complaint survives supervisory defendants' motion to dismiss.

## II. Motion for Sanctions

Nassan's motion to enforce sanctions is directed at Geoffrey N. Fieger ("Fieger"), who is counsel for plaintiffs. Upon consideration of the motion for sanctions, as well as plaintiffs' response in opposition (Docket No. 68), the court will deny Nassan's motion. To the extent that plaintiffs request attorney's fees in their response, the court will deny that request.

## A. Standard of Review with respect to Motion for Sanctions

Defendants moved for sanctions pursuant to Federal Rule of Civil Procedure 11. Rule 11 provides in pertinent part:

> **(a) Signature.** Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name — or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.
>
> **(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
>> **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>>
>> **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>>
>> **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>>
>> **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.
>
> **(c) Sanctions.**
>
>> **(1) In General.** If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose

an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

**(2) Motion for Sanctions.** A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

. . . .

**(4) Nature of a Sanction.** A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

. . . .

**(6) Requirements for an Order.** An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

FED. R. CIV. P. 11.

Rule 11 authorizes imposition of sanctions upon the signer of any pleading, motion or other paper that was presented for an improper purpose, e.g., "to harass or to cause unnecessary delay or needless increase in the cost of litigation." Landon v. Hunt, 938 F.2d 450, 452 (3d Cir. 1991). Rule 11 sanctions are based on "'an objective standard of reasonableness under the

circumstances.'" Id. at 453 n.3 (quoting Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94 (3d

Cir. 1988)); Ford Motor Co. v. Summit Motor Prod., Inc., 930 F.2d 277, 289 (3d Cir. 1991)

("The legal standard to be applied when evaluating conduct allegedly in violation of Rule 11 is

reasonableness under the circumstances."). Bad faith is not required. Landon, 938 F.2d at 453

n.3; Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1358 (3d Cir. 1990); Clement v. Public Serv.

Elec. And Gas Co., 198 F.R.D. 634, 637 (D.N.J. 2001).

Rule 11 "seeks to strike a balance between the need to curtail abuse of the legal system

and the need to encourage creativity and vitality in the law." Gaiardo v. Ethyl Corp., 835 F.2d

479, 483-84 (3d Cir. 1987). A "district court must exercise discretion and sound judgment in

dealing with the myriad methods with which lawyers may abuse the judicial process." Eavenson,

Auchmuty & Greenwald v. Holtzman, 775 F.2d 535, 540 (3d Cir. 1985). "Rule 11 is intended

for only exceptional circumstances." Gaiardo, 835 F.2d at 483.

The "safe harbor" provision of Rule 11 requires a moving party to serve a motion for

sanctions under Federal Rule of Civil Procedure 5, and to allow for the opposing party to take

remedial action "within 21 days after service or within another time the court sets." FED. R. CIV.

P. 11(c)(2); see Cannon v. Cherry Hill Toyota, Inc., 190 F.R.D. 147, 158-59 (D.N.J. 1999).

Nassan complied with this provision.


**B. Discussion with respect to Motion for Sanctions**

In Nassan's motion to enforce sanctions, he raised three main arguments: (1) Fieger

violated Rule 11(b)(3) by pleading materially false statements of fact and law and by omitting

essential facts in the pleadings in an attempt to mislead the court and the public, (2) Fieger

violated Rule 11(b)(3) by failing to conduct a reasonable inquiry before filing the original

complaint and the amended complaint, and (3) Fieger must be sanctioned as a result of past

disciplinary measures taken against him in other jurisdictions.

Plaintiffs responded to the motion. Plaintiffs argued that the Rule 11 motion improperly tests the legal efficacy of the allegations in complaint and amended complaint, and they conducted a "reasonable inquiry" as required by Rule 11(b). Plaintiffs additionally argued that Fieger's alleged misconduct in other jurisdictions has no relevance in determining whether the enforcement of sanctions is appropriate in this case.

### 1. Nassan's arguments that Fieger violated Rule 11(b)(3)

Nassan argues that, in violation of Rule 11(b)(3), plaintiffs misrepresented and omitted facts that mislead the court. Nassan also asserts that Fieger violated Rule 11(b)(3) by failing to conduct a reasonable inquiry with respect to the factual allegations in the complaint and amended complaint before filing those documents. Nassan specifically targets several of the allegations in the complaint under Rule 11(b)(3).

Nassan challenges plaintiffs' contention that Nicholas Haniotakis posed no risk of harm to the officers or others at the time of the shooting. (Am. Compl. ¶¶ 16-17.) Nassan asserts that toxicology reports indicate Nicholas Haniotakis was under the influence of alcohol and illegal substances while in control of his vehicle on the night of the incident, and therefore he posed a dangerous threat to the public. By omitting the results of the toxicology report, Nassan contends that Fieger engaged in a scheme to hide facts demonstrating that Nicholas Haniotakis used the vehicle as a weapon. Nassan argues that Fieger filed the original complaint just seventeen days after the alleged incident and was under no emergency or time constraints. Nassan argues this was calculated to avoid the inclusion in the complaint of the results of the toxicology report, and demonstrates Fieger's efforts to fashion a sham version of facts. Once the toxicology report, photographs, and news reports were released, Fieger ignored their significance when he filed the amended complaint. Defendants argue this ignorance demonstrated his failure to conduct a

reasonable inquiry.

Nassan additionally argues that the complaint and amended complaint imply that, after being followed by Nassan and Donnelly, Nicholas Haniotakis willfully "stopped" his automobile. (See Am. Compl. ¶ 15.)  Instead, Nassan maintains, Nicholas Haniotakis's car did not come to a stop until it impacted a telephone pole.  Nassan argues that the allegation that the vehicle stopped is materially false because it suggests that Nicholas Haniotakis acted as a law-abiding citizen, heeding police commands to stop his car.  Nassan asserts that the complaint and amended complaint falsely imply that the unlawful flight ended when the police shot Nicholas Haniotakis. Nassan argues that Fieger may not assert he relied upon "information and belief" in claiming that Nicholas Haniotakis stopped his car, because Nicholas Haniotakis is deceased and none of plaintiffs were witnesses to the incident.

Nassan attacks the failure of the amended complaint to elaborate on how "considerable distance and barriers" protected the police.  (Compl. (Docket No. 1) ¶ 17.)  Nassan argues that the court at oral argument directed plaintiffs to clarify the factual allegations regarding distance and barriers, and plaintiffs failed to do so in the amended complaint.  (See Am. Compl. ¶¶ 17-18.)

### 2. Plaintiffs' response to Nassan's arguments with respect to Rule 11(b)(3)

In opposition to the motion, plaintiffs contend that the imposition of sanctions pursuant to Rule 11(b)(3) is only appropriate when the filing of the complaint constitutes abusive litigation or misuse of the court's process, or where a litigant makes untruthful statements or misrepresentations to the court.  Plaintiffs argue that Nassan's motion to enforce sanctions is disingenuous, and that the motion was not filed for a purpose proper under Rule 11.  Plaintiffs assert the motion is simply a veiled attempt to maneuver around unsuccessful Rule 12(b)(6) motions to dismiss.  Plaintiffs refute Nassan's argument that Fieger failed to conduct a

reasonable inquiry. Plaintiffs argue that Rule 11 sanctions are not appropriate when the parties disagree about factual matters before the parties have been afforded discovery.

Plaintiffs contest Nassan's reliance upon toxicology reports, photographs, news reports, and press releases, arguing that these provide defendants with a self-serving account of events that are not dispositive of any factual issues. Plaintiffs note that they have been denied access to evidence gathered as part of a joint investigation between the Pittsburgh Bureau of Police and the Pennsylvania State Police. Specifically, with respect to the toxicology reports, plaintiffs deny that filing both the complaint and the amended complaint without referencing the reports is grounds for the imposition of Rule 11 sanctions. Plaintiffs assert that the reports are subject to expert interpretation, and, more importantly, are irrelevant because Nassan and Donnelly did not know who was driving the vehicle or have any information about Nicholas Haniotakis at the time of the shooting. Plaintiffs argue that whether Nicholas Haniotakis was under the influence of any substances does not create an objectively reasonable opportunity for Nassan to open fire. Instead, whether the use of deadly force was reasonable under the circumstances requires an assessment of all physical evidence and testimony from witnesses. The physical evidence and testimony will be revealed during discovery. Concerning the photographs of alleged damage caused by Nicholas Haniotakis the night of the incident, plaintiffs contend that the photographs are not authenticated.

With respect to Nassan's attack on the allegations regarding the barriers and distance between the officers and Nicholas Haniotakis, plaintiffs point to the court's statements during the November 19, 2009 hearing, whereby the court rejected defendants' argument that plaintiffs were required to plead a specific distance between the actors. Plaintiffs were merely asked to clarify that the alleged barriers were a reference to police vehicles.

### 3. Analysis

An attorney must conduct a reasonable inquiry before filing a lawsuit, and cannot pursue the action unless he or she reasonably believes that facts exist to support the allegations.  FED. R. CIV. P. 11(b)(3); see Chandler v. Norwest Bank Minn., Nat'l Ass'n, 137 F.3d 1053, 1057 (10th Cir. 1998) (holding that, although the attorney may have reasonably believed a claim would have evidentiary support, the attorney failed to conduct a reasonable inquiry).  The allegations in the complaint must be likely to have evidentiary support following "investigations or discovery," or, if so identified, "are reasonably based on a lack of information or belief."  5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1334 at 539 (3d ed. 2004).  A court must consider six factors in evaluating what constitutes a reasonable inquiry under the circumstances:

> (1) the amount of time available to the signer for conducting a factual and legal investigation; (2) the necessity of relying on a client for the underlying factual information; (3) the plausibility of the legal position advocated; (4) the complexity of the legal and factual issues implicated; (5) whether the signer depended on forwarding counsel or another member of the bar; and (6) whether the signer was in a position to know or acquire the relevant factual details.

See Hanoverian, Inc. v. Pa. Dep't of Envtl. Prot., No. 1:07-CV-00658, 2008 WL 906545, at *10 (M.D. Pa. Mar. 31, 2008) (citing CTC Imps. & Exps. v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir. 1991)).

With respect to the first factor, by the time the amended complaint – the subject of the Rule 11 motion – was filed, Fieger had a relatively long period of time to conduct an investigation.  At the time Fieger signed the amended complaint, however, he was not in a position to know or acquire all relevant factual details.  Plaintiffs assert that the results of an investigation jointly performed by the Pittsburgh Bureau of Police and the Pennsylvania State

Police were not shared with plaintiffs, making plaintiffs' investigation more difficult. With respect to the second factor, Fieger could not rely upon a client for underlying factual information in this case, because Nicholas Haniotakis is deceased. With respect to the third factor, the position asserted by plaintiffs is plausible, as plausibility was already analyzed in the context of the motions to dismiss. With respect to the fourth factor, the factual issues implicated are particularly complex, since, under Fourth Amendment jurisprudence, the analysis concerns the reasonableness of defendants' actions under the circumstances. Such an analysis is fact-intensive and will require discovery to bring to light all pertinent facts. The fifth factor is not implicated in this case.[9] The sixth factor is problematic by reason of the investigation results not being shared with plaintiffs. After considering all the relevant factors, the court finds that they weigh in favor of a finding that the inquiry by Fieger was reasonable.

To determine whether Fieger misrepresented facts included in the complaint and amended complaint requires the court to consider the plausibility of the allegations in those pleadings. Fieger's filing of the suit seventeen days after the incident does not, without more, demonstrate that he intended to make false factual allegations to the court. The assertions that Nicholas Haniotakis posed no risk of harm to the officers at the time of the shooting, Nicholas Haniotakis stopped his vehicle, and barriers were present arguably could be misleading if Nassan's characterization of the facts is accurate. Nassan, however, does not specifically refute that Nicholas Haniotakis's car was stopped at the time he was shot – Nassan argues it was stopped because Nicholas Haniotakis hit a telephone pole – or that Nicholas Haniotakis was shot in the back. Under those circumstances, at this stage the court cannot find Fieger failed to conduct a

---

[9] The court notes that the amended complaint was also signed by Austin Henry ("Henry"), local counsel for plaintiffs (Am. Compl. at ¶ 21.) There are no contentions with respect to the extent of each attorney's participation in the investigation of the case, and it is not known if an attorney for plaintiffs relied upon co-counsel. Under those circumstances, it is perplexing that Nassan did not reference Henry in the motion. The averments in Nassan's Rule 11 motion focus solely on the conduct of Fieger.

reasonable inquiry or did not reasonably believe facts exist that refute defendants' version of the facts.

With respect to Nassan's arguments concerning omitted facts, the court recognizes that the omission of "facts that [a]re highly relevant to an accurate characterization of the facts" stated may be a basis for the imposition of Rule 11 sanctions. In re Ronco, Inc., 838 F.2d 212, 218 (7th Cir. 1988). For example, in Association of Minority Contractors & Suppliers v. Halliday Properties, Inc., No. 97-274, 1998 WL 480835, at *6 (E.D. Pa. Aug. 13, 1998), the plaintiff brought antitrust claims against the defendants, alleging the defendants were part of a conspiracy to prevent the plaintiff from obtaining bonding that was necessary for the plaintiff to be awarded a construction contract. The plaintiff's claims involved issues of fact surrounding the activities at meetings the defendants had with alleged co-conspirators, and the details of those meetings were unknown to the plaintiffs at the time of the filing of the amended complaint. Discovery revealed that the defendants' actions were not in violation of the antitrust laws. The court stated that "[w]hile Defendants believe that discovery did not develop those facts in [the plaintiff's] favor, it does not necessarily result in an imposition of Rule 11 sanctions," especially in a case that required significant discovery regarding specific communications at the meetings. Id. The court was more troubled by the plaintiff's use of "pleading techniques, including the use of the term 'co-conspirators' in the Amended Complaint instead of revealing the identity of those individuals, to avoid a motion to dismiss." Id. Despite this, the court held that sanctions were not appropriate. Many facts depended on information that could only be uncovered during discovery:

> In some cases, [the plaintiff's pleading] techniques could lead to the imposition of sanctions. The court recognizes that [the plaintiff's] counsel's drafting of the Amended Complaint *comes close to crossing the line between stating the facts in the client's favor and omitting key facts*. However, the court again recognizes

> that in this case, many of the crucial facts, including the identity of all of the individuals involved, were likely unknown to [the plaintiff] and depended solely on information known only to the participants in the alleged conspiracy which could only be found through the discovery process. The broad discovery rules permitted in the federal court system serves, in part, to allow plaintiffs to develop such unknown factual issues and to allow defendants to uncover the details which are inevitably lacking in a complaint under the notice pleading system.

Id. (emphasis added). Although the notice pleading system arguably has been affected by the Iqbal decision, the discovery rules have been not been significantly altered since the Association of Minority Contractors & Suppliers decision. The principles behind the discovery process set forth in Association of Minority Contractors & Suppliers still apply today.

This case is similar to Association of Minority Contractors & Suppliers in that discovery is necessary to refine the facts. At this juncture, given the matters not disputed by Nassan, the court cannot conclude the plaintiffs' characterization of the facts is unreasonable. As already analyzed in the context of the motions to dismiss the amended complaint, plaintiff is not obligated to plead facts that support defendants' qualified immunity arguments.

There is no evidence to suggest that Fieger brought this action for an improper purpose such as harassment or delay. Such a showing is an important consideration in determining whether to award sanctions. See Rosenberg v. JCA Assocs., Inc., No. 03-0274, 2007 WL 1038893, at *19 (D.N.J. Mar. 30, 2007) (noting a party's "motivation for bringing [the] lawsuit is an important element in determining whether to award attorney's fees and sanctions," and denying a motion for sanctions since there was no evidence that the action was brought for improper purposes); Goodman v. Goodman, No. 04-3869, 2007 WL 748445, at *2 (D.N.J. Mar. 6, 2007) ("Before it can impose sanctions, this Court must find that the amended complaint was not objectively reasonable or was filed for an improper purpose"). In light of the foregoing, the court must deny Nassan's motion to enforce sanctions.

### 4. Fieger's alleged past misconduct

Nassan also bases the motion to enforce sanctions on Fieger's past conduct in other jurisdictions. Nassan argues that Fieger's past conduct is a factor in favoring the imposition of Rule 11 sanctions against him. Plaintiffs deny several of the allegations that Fieger was sanctioned in the past. A history of litigation abuses may be a relevant consideration in determining whether sanctions are warranted. See McLaughlin v. Bradlee, 602 F. Supp. 1412, 1418 (D.D.C. 1985). Even assuming Nassan's allegations of past misconduct are true, however, the court cannot find in the specific context of this motion that his conduct outweighs the relevant factors that the court considered in evaluating the reasonableness of the inquiry conducted by plaintiffs' counsel.

### 5. Plaintiffs' request for attorney's fees

In responding to the motion, plaintiffs assert an entitlement to an award of counsel fees for the costs incurred in responding to Nassan's "frivolous Rule 11 motion." (Docket No. 68 at 24.) Plaintiffs did not, however, file a motion requesting attorney's fees, and the issue has not been fully briefed. A filing is "frivolous" for Rule 11 purposes if it is both baseless and made without a reasonable inquiry. Holgate v. Baldwin, 425 F.3d 671, 676 (9th Cir. 2005). There were sufficient matters of concern raised by Nassan in the Rule 11 motion that even if plaintiffs' request for fees is fully briefed, the likelihood of an award in plaintiffs' favor is remote. The court will not address plaintiffs' demand.

### *Conclusion*

For the reasons set forth above, the motions to dismiss are denied, and the motion to enforce sanctions is denied.

### *Order*

THE COURT HEREBY ORDERS that the motion to dismiss amended complaint filed by Trooper Samuel Nassan (Docket No. 71), the motion to dismiss amended complaint filed by Sergeant Terence Donnelly (Docket No. 70), and the motion to dismiss filed by Commissioner Frank Pawlowski, Major Terry Seilhamer, Captain Sheldon Epstein, and Lieutenant David Heckman (Docket No. 73) are DENIED.  IT IS FURTHER ORDERED that the motion to enforce sanctions filed by Trooper Samuel Nassan (Docket No. 63) is DENIED.

THE COURT FURTHER ORDERS that defendants shall file answers to the amended complaint by August 13, 2010, and that, within twenty-one days of the filing of the answers, plaintiffs must file a reply responding to the factual allegations in the answers.  This ruling is without prejudice to defendants' ability to file motions for judgment on the pleadings with respect to qualified immunity after plaintiffs reply to the answers.

Dated:   July 23, 2010

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Court Judge