**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DIANE ZION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-0383 |
| | ) | |
| v. | ) | |
| | ) | |
| TROOPER SAMUEL NASSAN, et al., | ) | |
| | ) | |
| Defendants. | ) | Judge Joy F. Conti |
| | ) | |
| | ) | |

**DEFENDANT TROOPER SAMUEL NASSAN'S ANSWER,
ADDITIONAL QUALIFIED IMMUNITY ALLEGATIONS, AND
<u>AFFIRMATIVE DEFENSES TO THE FIRST AMENDED COMPLAINT</u>**

Defendant Trooper Samuel Nassan ("Trooper Nassan"), by and through his undersigned counsel, hereby submits this Answer, Additional Qualified Immunity Allegations, and Affirmative Defenses to the First Amended Complaint ("Complaint"), and states as follows:

<u>**INTRODUCTION**</u>

1.     Paragraph 1 states the general nature of the action, legal conclusions, and the relief sought by Plaintiffs, and therefore no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan admits that Plaintiffs bring claims pursuant to 42 U.S.C. §§ 1983 & 1988, admits that this Court has jurisdiction over those claims, and denies liability.

<u>**PARTIES**</u>

2.     Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of that averment, and therefore denies that averment.

3.     Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of that averment, and therefore denies that averment.

4.      Denied in part; admitted in part.  Trooper Nassan admits that he is now and was at the time of the subject shooting alleged in the Complaint a Pennsylvania State Police officer. Trooper Nassan further admits that at all relevant times he was acting under color of state law and is being sued in his individual capacity.  Trooper Nassan denies that he is a patrol officer with Troop B in Fayette County, Pennsylvania.

5.      The averments in Paragraph 5 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, Trooper Nassan admits that on the night of the subject shooting, he was working a roving DUI patrol with Sergeant Donnelly.  The remaining averments constitute legal conclusions to which no response is required.

6.      The averments in Paragraph 6 are directed to other Defendants and thus no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 6 pertaining to himself and denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al.*, No. 03-0223 (W.D. Pa.).

7.      The averments in Paragraph 7 are directed to other Defendants and thus no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 7 pertaining to himself and denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al.*, No. 03-0223 (W.D. Pa.).

8.      The averments in Paragraph 8 are directed to other Defendants and thus no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 8 pertaining to himself and denies Plaintiffs'

characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al.*, No. 03-0223 (W.D. Pa.).

9.      The averments in Paragraph 9 are directed to other Defendants and thus no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 9 pertaining to himself and denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al.*, No. 03-0223 (W.D. Pa.).

## COMMON FACTUAL ALLEGATIONS

10.      Denied in part; admitted in part.  Trooper Nassan admits that on March 15, 2009, around 1:30 am, he and Sergeant Donnelly pursued Mr. Haniotakis.  Trooper Nassan denies that the reason that he and Sergeant Donnelly pursued Mr. Haniotakis was that Mr. Haniotakis had a broken headlight.  To the contrary, Trooper Nassan and Sergeant Donnelly began following Mr. Haniotakis after Mr. Haniotakis drove his vehicle into the intersection of East Carson Street, directly toward the driver's door of Trooper Nassan's unmarked police car and began making erratic, aggressive jerking motions with his SUV, demonstrating that he was likely impaired by alcohol and/or drugs, and then subsequently fled when Trooper Nassan flashed the interior police lights in his vehicle and began to exit the police car to approach Mr. Haniotakis's vehicle.

11.      Admitted.

12.      Denied in part; admitted in part.  Trooper Nassan admits that he did not know Mr. Haniotakis's identity during the high-speed pursuit of Mr. Haniotakis and subsequent shooting of Mr. Haniotakis.  Trooper Nassan denies that he "possessed no information about the driver including his condition, state of mind, intentions or any other information."  To the contrary, Trooper Nassan observed Mr. Haniotakis's erratic, aggressive jerking motions with his SUV into a crowded street and the commencement of reckless flight when the officers flashed their interior

lights.  The officers further possessed information from observations of Mr. Haniotakis, including his rate of speed accompanied by his disregard of several traffic signs.  They possessed information that the driver lost control of his vehicle after failing to execute a right-hand turn.  They possessed information regarding the driver's actions after he crashed, including his refusal to stop and submit to public authority.  They possessed information that the driver used his car as a weapon against them, and that his continued flight endangered them and the public.

13.     Denied.  During the high-speed pursuit of Mr. Haniotakis and the subsequent subject shooting, Trooper Nassan observed Mr. Haniotakis commit numerous crimes, including but not limited to: (1) attempted murder of a law enforcement officer (attempt at 18 Pa. C.S. § 901; murder of a law enforcement officer at 18 Pa. C.S. § 2507; maximum 20-year-sentence at 18 Pa. C.S. § 1102(c)); (2) aggravated assault (first-degree felony at 18 Pa. C.S. § 2702); (3) fleeing or attempting to elude police officer (third-degree felony at 75 Pa. C.S. § 3733(a.2)(2)(iii)); (4) multiple counts of recklessly endangering another person (second-degree misdemeanor at 18 Pa. C.S. § 2705); (5) at least one count of leaving the scene of an accident involving damage to attended vehicle or property (third-degree misdemeanor at 75 Pa. C.S. § 3743); (6) reckless driving (summary offense at 75 Pa. C.S. § 3736); (7) careless driving (summary offense at 75 Pa. C.S. § 3714); (8) exceeding maximum speed limits (summary offense at 75 Pa. C.S. § 3362); (9) multiple counts of driving vehicle at unsafe speed near intersections, curves, or narrow roadways (summary offense at 75 Pa. C.S. § 3361); (10) multiple counts of failure to obey stop signs and yield signs (summary offense at 75 Pa. C.S. § 3323); and (11) leaving the scene of an accident involving damage to unattended vehicle or property (summary offense at 75 Pa. C.S. § 3745).  Additionally, had Mr. Haniotakis not fled, Trooper Nassan could have also charged him with: (1) driving under influence of alcohol or controlled substance (criminalized at 75 Pa. C.S. § 3802; graded up to first-degree misdemeanor by 75 Pa.

C.S. § 3803 with mandatory minimum penalties at 75 Pa. C.S. § 3804); (2) driving while

operating privilege is suspended or revoked (criminalized and graded up to first-degree

misdemeanor by 75 Pa. C.S. § 1543); and (3) unauthorized use of vehicle registration (75 Pa.

C.S. § 1372).

14.     Denied.  Trooper Nassan denies that he was instructed by dispatch and/or a

superior officer to discontinue the pursuit of the Haniotakis vehicle.  Furthermore, Trooper

Nassan denies that he refused to follow any such purported instruction.  Trooper Nassan was on

a Pennsylvania State Police "Tac" radio line during the high-speed chase of Mr. Haniotakis, and

Sergeant Donnelly was on a separate Pittsburgh City Police "Tac" radio line.  During the high-

speed chase, Trooper Nassan did not hear any instruction given on the Pittsburgh City Police

"Tac" radio line.

15.     Denied.  Contrary to the allegation in Paragraph 15, Mr. Haniotakis's vehicle was

not "stopped" at the time of the subject shooting.  Mr. Haniotakis crashed his vehicle into a

parked car during the high-speed chase, and he then reversed his vehicle toward Trooper Nassan,

attempting to strike Trooper Nassan, and then accelerated his car toward Sergeant Donnelly,

attempting to strike Sergeant Donnelly.  Trooper Nassan discharged his weapon and shot Mr.

Haniotakis during the period Mr. Haniotakis was using his SUV as a weapon against the officers.

16.     Denied.  Mr. Haniotakis possessed and used his vehicle as a weapon.

17.     The averments constitute legal conclusions to which no response is required.  To

the extent a further response is deemed to be required, these averments are denied.  At all

material times, Mr. Haniotakis posed a serious threat of harm to Trooper Nassan and Sergeant

Donnelly, as well as individuals in the area of the chase and the shooting, and his continuation of

flight jeopardized the public at large.  Further, it is denied that police officers are taught to use

their vehicle as a barrier under all circumstances, including the circumstances as presented by this case.

18.    The averments constitute a legal conclusion to which no response is required.  To the extent a further response is deemed to be required, the averments are denied.  The officers did, in fact, use their vehicle to attempt to barricade Mr. Haniotakis and thereby protect themselves and the public.

19.    Denied.  Trooper Nassan had a justifiable excuse or reason to discharge his weapon—specifically, the risk of harm posed by Mr. Haniotakis's actions to Trooper Nassan, Sergeant Donnelly, others in the vicinity, and the public at large.  Further, Trooper Nassan denies that Mr. Haniotakis was "unarmed," as Mr. Haniotakis was using his vehicle as a weapon.

20.    Denied in part; admitted in part.  Trooper Nassan admits that he fired shots at Mr. Haniotakis, striking Mr. Haniotakis's body.  Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of the remaining averments, and therefore denies those averments.

21.    With respect to the preamble of Paragraph 21, it is admitted that Mr. Haniotakis did not die at the scene of the shooting, as Mr. Haniotakis continued his vehicular flight after being shot.  Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of any remaining factual allegation of Paragraph 21, and therefore denies all such averments.  With respect to the sub-paragraphs of Paragraph 21, Trooper Nassan denies liability.

22.    Denied in part; admitted in part.  Trooper Nassan admits that he was in the U.S. Marines and that he was a trained sharp shooter.  Trooper Nassan denies the remaining allegations, including the false accusations that he had a history of violent run-ins with Marine Corps officers and that he inflicted injuries upon a high-ranking officer.

23.     Denied in part; admitted in part.  Trooper Nassan admits that he applied to the

Pennsylvania State Police, and submitted information for a background check as part of that

application process.  Trooper Nassan denies that he left the military without an honorable

discharge; to the contrary, Trooper Nassan left the Marines **with** an honorable discharge.

Trooper Nassan further denies that Trooper Murphy performed his background check.  With

respect to the remaining allegations directed at Trooper Murphy, Trooper Nassan is without

knowledge or information to form a belief as to the truth or falsity of those averments, and

therefore denies them.

24.     Denied.  Trooper Nassan denies that Trooper Murphy performed his background

check and therefore denies that Trooper Murphy engaged in the purported cover-up, redaction of

his record, or conspiracy alleged in Paragraph 24.  Furthermore, Trooper Nassan denies all

averments pertaining to himself, including but not limited to, the false accusations regarding

Trooper Nassan's alleged "history and violent propensities."

25.     Denied.  Trooper Nassan denies that he was involved in any such altercations with

state police supervisors and local police officers.  With respect to the allegation regarding Barry

Gaston, Trooper Nassan denies that he had a physical confrontation with Barry Gaston.  Trooper

Nassan had a verbal argument with Mr. Gaston, which was initiated by Mr. Gaston and which

led to Mr. Gaston being relocated due his unprofessional behavior.  With respect to the allegation

regarding Corporal Tony Guy, Trooper Nassan denies that he engaged in any such physical

confrontation with Corporal Guy.

26.     The averments in Paragraph 26 are directed to other Defendants and thus no

response is required.  To the extent a further response is deemed to be required, with respect to

those averments, Trooper Nassan is without knowledge or information to form a belief as to the

truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan

denies all averments pertaining to himself, including but not limited to, the false accusations that he has a propensity for violence or engaged in the misconduct or altercations alleged in the Complaint.

27.     The averments in Paragraph 27 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusations that he has a propensity for violence or engaged in the misconduct or altercations alleged in the Complaint.

28.     The averments in Paragraph 28 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusations that he has a propensity for violence or engaged in the misconduct or altercations alleged in the Complaint.

29.     The averments in Paragraph 29 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusations that he has a propensity for violence or engaged in the misconduct or altercations alleged in the Complaint.

30.     Denied in part; admitted in part.  Trooper Nassan admits that he was not disciplined for the alleged incidents involving Gaston or Guy, because there was no reason for him to be disciplined.  Trooper Nassan denies that these alleged incidents were covered up or kept away from Trooper Nassan's employment file.  The remaining averments in Paragraph 30 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, Trooper Nassan denies all other averments pertaining to himself, including but not limited to, the false accusations that he has a propensity for violence, or engaged in the misconduct or altercations alleged in the Complaint.

31.     (Intentionally left blank due to misnumbering of the paragraphs in the Complaint)

32.     Denied.  Trooper Nassan denies Plaintiffs' characterization that he has had a "number" of "run-ins" with members of the public, and also denies the characterization that these "run-ins" relate to a "propensity to use violence against members of the public without excuse or justification."

33.     Trooper Nassan denies that he had the purported confrontations.  The remaining averments are directed to other Defendants, and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.

34.     Trooper Nassan denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al*., No. 03-0223 (W.D. Pa.), and refers the Court to the actual evidence of record and verdict by the jury.

35.     Trooper Nassan denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al*., No. 03-0223 (W.D. Pa.), and refers the Court to the actual evidence of record and verdict by the jury.

36.     Trooper Nassan denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al.*, No. 03-0223 (W.D. Pa.), and refers the Court to the actual evidence of record and verdict by the jury.  With respect to the remaining averments, those averments are directed to other Defendants, and thus no response is required. To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.

37.     Denied.  Trooper Nassan denies the characterization of the newspaper article cited in Paragraph 37 of the Complaint, including without limitation, Plaintiffs' omission of a sentence from the quoted material that reads, "I don't think you can make that decision based on one case[,]" and Trooper Nassan refers the Court to the actual content of the article for what was reported.

38.     Denied in part; admitted in part.  With respect to the averments directed toward Colonel Pawlowski, those averments are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Trooper Nassan admits that no disciplinary action was taken against him, because based on the circumstances of the incident, including Trooper Nassan's well-founded belief that Michael Ellerbe was an armed suspect and had fired shots at Trooper Nassan's partner, Trooper Nassan's actions were justified.

39.     The averments in Paragraph 39 are directed to other Defendants, and thus no response is required.  To the extent a further response is deemed to be required, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.

40.     Denied.  Trooper Nassan denies that such changes were made to his evaluation or that he received anything less than "outstanding" and "commendable" marks on his 2008 evaluation.

41.     Trooper Nassan denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al*., No. 03-0223 (W.D. Pa.), and refers the Court to the actual evidence of record and verdict by the jury.  With respect to the remaining averments, those averments are directed to other Defendants, and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Trooper Nassan further denies the characterizations regarding the settlement in *Hickenbottom v. Nassan, et al*., No. 03-0223 (W.D. Pa.), by which plaintiff's counsel (which is the same counsel for Plaintiffs here) agreed to a settlement in lieu of having trial misconduct issues reviewed by the Third Circuit.

42.     The averments in Paragraph 42 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusation that he has a violent history.

43.     The averments in Paragraph 43 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan

denies all averments pertaining to himself, including but not limited to, the false accusations regarding purported violent and illegal behavior.

44.    The averments in Paragraph 44 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, with respect to those averments, Trooper Nassan is without knowledge or information to form a belief as to the truth or falsity of those averments, and therefore denies them.  Furthermore, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusations regarding purported wrongful behavior and excessive force as alleged in the Complaint.

## COUNT I
### (42 U.S.C. § 1983—Defendants Nassan and Donnelly)

45.    Trooper Nassan repeats and incorporates by reference his responses to the averments in the Complaint as stated above.

46.    Paragraph 46 contains legal conclusions to which no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 46.

47.    Paragraph 47 contains legal conclusions to which no response is required.

48.    Paragraph 48 contains legal conclusions to which no response is required.

49.    Denied.

50.    Denied.

51.    Paragraph 51 contains legal conclusions to which no response is required.  To the extent that a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 51.

<u>COUNT II</u>
**(42 U.S.C. § 1983—Defendants Pawlowski, Seilhamer, Heckman, and Epstein)**

52.     Trooper Nassan repeats and incorporates by reference his responses to the averments in the Complaint as stated above.

53.     The averments in Paragraph 53 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusations regarding a propensity for violence and violent confrontations described in Paragraph 53.

54.     The averments in Paragraph 54 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, Trooper Nassan denies all averments pertaining to himself, including but not limited to, the false accusation that Trooper Nassan lied about the circumstances surrounding the Ellerbe shooting.

55.     The averments in Paragraph 55 are directed to other Defendants and thus no response is required.  To the extent a further response is deemed to be required, Trooper Nassan denies all averments pertaining to himself, including but not limited to, Plaintiffs' complete distortion of his military record.

56.     Paragraph 56 contains legal conclusions and is directed to other Defendants, and therefore no response is required.  To the extent a further response is deemed to be required, Trooper Nassan denies the averments in Paragraph 56 pertaining to himself, including but not limited to, the false accusations regarding Trooper Nassan's character, fitness, and prior conduct.

57.     Paragraph 57 contains legal conclusions and are directed to other Defendants, and therefore no response is required.  The injuries and damages claimed by Plaintiffs herein were caused by the reckless conduct of Mr. Haniotakis and his use of the car as a weapon, which justified the use of force.  To the extent a further response is deemed to be required, Trooper

Nassan denies the averments in Paragraph 57 pertaining to himself, including but not limited to, the false accusations regarding Trooper Nassan's prior conduct.  Trooper Nassan further denies Plaintiffs' characterization of the shooting incident, evidence, and verdict in *Hickenbottom v. Nassan, et al*., No. 03-0223 (W.D. Pa.), and refers the Court to the actual evidence of record and verdict by the jury.

58.     Paragraph 58 contains legal conclusions and are directed to other Defendants, and therefore no response is required.  To the extent that a response may be required, Trooper Nassan denies the averments in Paragraph 58 pertaining to himself.

59.     Paragraph 59 contains legal conclusions and are directed to other Defendants, and therefore no response is required.  To the extent that a response may be required, Trooper Nassan denies the averments in Paragraph 59 pertaining to himself.

### COUNT III
### (Assault and Battery—Defendant Nassan)

60.     Trooper Nassan repeats and incorporates by reference his responses to the averments in the Complaint as stated above.

61.     Paragraph 61 contains only legal conclusions to which no response is required. To the extent that a response may be required, Trooper Nassan denies the averments in Paragraph 61.

62.     Paragraph 62 contains only legal conclusions to which no response is required. To the extent that a response may be required, Trooper Nassan denies the averments in Paragraph 62.

### ADDITIONAL QUALIFIED IMMUNITY ALLEGATIONS

Pursuant to this Court's orders (Docs. 86, 94), and the Third Circuit's decision in *Thomas v. Independence Twp*., 463 F.3d 285 (3d Cir. 2006), Trooper Nassan provides the

following additional allegations, which bear on his defense of qualified immunity, and to which Plaintiffs are to reply pursuant to the Court's orders.

**A.    Trooper Nassan's Background as a Drug Recognition Expert**

1.    Trooper Nassan has been a state trooper with the Pennsylvania State Police since approximately 2002.

2.    Trooper Nassan is what is called a "Drug Recognition Expert" (or "DRE"), having obtained special training that allows him to determine when an individual has been driving under the influence of drugs and to identify the type of drug causing impairment.  In fact, Trooper Nassan is an instructor for the DRE program, and has been one since before the time of the subject shooting.

**B.    St. Patrick's Day Roving DUI Patrol**

3.    In the course of his duties, Trooper Nassan has worked roving DUI patrols in conjunction with the City of Pittsburgh Police Department, including working such patrols on weekend nights in Pittsburgh's Southside neighborhood—a neighborhood that has a number of bars and nightclubs and is well-known for its popular nightlife activities.

4.    St. Patrick's Day is a well-celebrated holiday in the City of Pittsburgh, which usually boasts one of the largest St. Patrick's Day parades in the country.

5.    On Saturday March 14, 2009, the City of Pittsburgh held its St. Patrick's Day parade, drawing thousands of people.  Many individuals throughout the city celebrated the holiday that day and through the night, including by frequenting nightclubs and bars in the Southside and going from bar to bar in what are called "bar crawls" in the Southside.

6.    Because of these festivities and the obvious DUI concerns, particularly in and around the Southside, on the night of March 14, 2009 (and into the early morning of March 15,

2009), Trooper Nassan and Sergeant Donnelly were working a DUI detail, which included the Southside.

7.      Trooper Nassan was driving his unmarked police vehicle—a maroon-colored Ford Crown Victoria—and Sergeant Donnelly was accompanying him in the passenger's seat. Both officers were in uniform.

8.      At approximately 1:30 am, Trooper Nassan and Sergeant Donnelly were proceeding east on East Carson Street, which is the major avenue running through the Southside and which is where most of the nightclubs, bars, and restaurants are located.

9.      Due to the St. Patrick's Day activities, numerous pedestrians were walking on the sidewalks and streets, parked cars were lining both sides of the street, and traffic along East Carson Street was bumper to bumper.

10.      Because of the bumper-to-bumper traffic, Trooper Nassan's vehicle was on East Carson Street directly in front of 13th Street, which intersects East Carson Street, thereby blocking traffic from proceeding along 13th Street.

11.      At or around this time, Mr. Haniotakis was driving a white Oldsmobile Bravada SUV, with an Ohio license plate, and traveling southbound on 13th Street toward East Carson Street.

12.      Mr. Haniotakis purchased the Bravada in or around January 2009 from an Ohio resident who advertised the sale of his SUV on the website "craigslist.com." Mr. Haniotakis informed the seller of the SUV that he would change the license-plate information when he returned home, which was a false statement. To the contrary, Mr. Haniotakis did not change the license-plate information from the prior owner to his own name, which is a violation of both Ohio and Pennsylvania law. *See* Ohio Rev. Code § 4549.11 ("No person shall operate or drive upon the highways of this state a motor vehicle acquired from a former owner who has registered

16

the motor vehicle, while the motor vehicle displays the distinctive number or identification mark assigned to it upon its original registration."); 75 Pa. C.S.A. § 1372 ("No person shall: (2) use any registration card or plate or permit unless authorized to do so; or (3) display a registration card or plate in, on or in connection with any vehicle other than the vehicle for which it was issued.").

13.     Mr. Haniotakis drove his SUV into the intersection of East Carson Street, directly toward the driver's door of Trooper Nassan's unmarked police car and began making erratic, aggressive jerking motions with his SUV.

14.     In light of Mr. Haniotakis's erratic driving behavior, Trooper Nassan formed the belief at that time that Mr. Haniotakis was impaired either by alcohol or drugs.

15.     In fact, Trooper Nassan's belief was well-founded.  On autopsy, it was later discovered that Mr. Haniotakis's blood alcohol was .167%, which is twice the legal limit.  75 PA. CONS. STAT. ANN. § 3802.  He also tested positive for a cocktail of dangerous drugs, including alprazolam (Xanax), methadone, morphine, benzoylecgonine (the primary metabolite of cocaine), and cocaethylene, a substance which forms during co-administration of cocaine and alcohol.  A true and correct copy of the autopsy report is attached to this Answer as Exhibit A.

16.     Trooper Nassan placed his vehicle in park, activated the emergency lights in his vehicle, and began exiting the vehicle to approach Mr. Haniotakis's SUV.

**C.     The High-Speed Chase**

17.     Upon seeing Trooper Nassan begin exiting his vehicle, Mr. Haniotakis slammed his SUV in reverse, proceeding backwards down 13th Street, attempting to flee from the officers.

18.     Based on Mr. Haniotakis's actions and Trooper Nassan's training and experience, Trooper Nassan concluded that Mr. Haniotakis's flight from police likely meant that Mr. Haniotakis was impaired by alcohol or illegal drugs, that Mr. Haniotakis possessed alcohol or

illegal drugs, that Mr. Haniotakis was driving with a suspended driver's license, or that he had committed a crime whereby any additional traffic citations or arrests would result in additional punishment.

19.     Trooper Nassan's conclusion was correct.  Mr. Haniotakis was driving an SUV registered to another individual (which is a criminal offense), Mr. Haniotakis was driving with a suspended driver's license for committing numerous crimes (also a criminal offense), and, as noted above, Mr. Haniotakis was impaired by both alcohol and drugs.  A true and correct copy of Mr. Haniotakis's Pennsylvania Department of Transportation Bureau of Driver Licensing Certified Driver History is attached as Exhibit B.  Notably, one of the many of Mr. Haniotakis's past criminal transgressions for which his license was suspended was a 2005 incident whereby Mr. Haniotakis used his vehicle as a weapon against a police officer.  A true and correct copy of the criminal complaint/affidavit of probable cause from the police investigative file is attached as Exhibit C, and criminal disposition is attached as Exhibit D.

20.     Mr. Haniotakis reversed down 13th Street through a stop sign and turned onto Bingham Street, heading west.

21.     Mr. Haniotakis proceeded on Bingham Street, which is an extremely narrow street with cars parked on both sides.  From Bingham Street, he made three successive sharp turns (one right, one left, one right), onto a brick-road section of 12th street, heading north.

22.     Mr. Haniotakis then turned right from 12th Street onto Muriel Street, ignoring a stop sign, and continued east on Muriel Street, running a stop sign at 13th Street, a yield-to-pedestrians sign at 15th Street, and another stop sign at 17th Street.

23.     Mr. Haniotakis turned on 17th Street, heading north, and then quickly turned right on Wharton Street, heading east.

24.     Wharton Street is a long straightaway, which gave Mr. Haniotakis an opportunity to increase his already high rate of speed.

25.     Mr. Haniotakis drove down Wharton Street, going at excessive rates of speed, with Trooper Nassan following in pursuit behind.

26.     There are stop signs at every intersection of Wharton Street (at 18th, 19th, 20th, 21st, and 22nd Streets), which Mr. Haniotakis ran, posing a threat of harm to drivers at those intersections.

27.     Wharton Street is a busy street, with two strip malls, restaurants, the Southside's primary 24-hour grocery store, public bus stops, residential homes, and a drug rehabilitation clinic.  During the high-speed chase, there were pedestrians in the area, and Mr. Haniotakis posed a threat of harm to these individuals.

28.     Wharton Street dead ends at 22nd Street.  Mr. Haniotakis, running the stop sign at that intersection, turned right, lost control of his SUV, went across the center lane, and struck a parked Toyota Corolla on the opposite side of 22nd Street.  True and correct copies of the photographs of the damaged Toyota Corolla are attached as Exhibits E, F, G, H, and I.

29.     The speed limit for the foregoing streets was not greater than 25 mph.  During this high-speed chase, Mr. Haniotakis greatly exceeded this speed limit.

30.     Further, during this high-speed chase, there were numerous vehicles parked along the sides of the streets.

**D.     The Shooting and Subsequent Flight**

31.     Upon Mr. Haniotakis's crashing his SUV into the Toyota Corolla, Trooper Nassan pulled his vehicle behind the SUV in a felony traffic stop manner.

32.     Trooper Nassan exited the vehicle, moving toward the driver's side of the SUV. Sergeant Donnelly also exited the vehicle, moving toward the passenger side of the SUV.

33.     Both officers began yelling commands, including but not limited to, "State Police! Let me see your hands!"  Mr. Haniotakis ignored all verbal commands and did not turn off his engine or cede to police authority.

34.     In response, Mr. Haniotakis reversed his vehicle in the direction of Trooper Nassan, who was standing behind and to the left side of the SUV.  Mr. Haniotakis, while in reverse, collided with the left front area of the police car.  True and correct copies of the photographs of the damage to the rear of Mr. Haniotakis's SUV are attached as Exhibits J and K. True and correct copies of the photographs of the damage to the front left of the police vehicle are attached as Exhibits L, M, and N.

35.     Mr. Haniotakis then directed the SUV forward again into the parked Corolla, and then reversed sharply toward Trooper Nassan, thereby creating a risk of harm to Trooper Nassan.

36.     As the SUV was moving toward him, Trooper Nassan shot at Mr. Haniotakis.

37.     At this point, Mr. Haniotakis's SUV was in a position by which he could go directly straight down 22nd Street and away from the officers.

38.     Instead of proceeding straight, Mr. Haniotakis turned the wheel of his SUV to the right and toward Sergeant Donnelly, thereby creating a risk of harm to Sergeant Donnelly.

39.     As the SUV was moving toward Sergeant Donnelly, Trooper Nassan and Sergeant Donnelly shot at Mr. Haniotakis.

40.     The SUV was moving when the officers fired their weapons.

41.     The shooting occurred in front of Rugger's Bar.

42.     At the time that the SUV was heading toward Sergeant Donnelly, it was also generally facing the direction of East Carson Street, near one of the major arteries to and from the Southside—the Birmingham Bridge.  Mr. Haniotakis's continuing flight posed a serious risk

of harm to those using the bridge and to the large crowds enjoying the St. Patrick's Day
festivities at the numerous bars located on East Carson Street, as well as the public at large.

43.     Mr. Haniotakis did, in fact, pose such a risk of harm, because, even after being
shot, he sped away, driving at a high rate of speed south on 22nd Street, through a stop sign,
through a traffic light at East Carson Street, and eventually crashed his SUV into a telephone
pole at the corner of 22nd Street and Sarah Street.  True and correct copies of the photographs of
the damaged SUV against the telephone pole are attached as Exhibits O, P, Q, R, and S.

44.     Trooper Nassan and Sergeant Donnelly pursued Mr. Haniotakis to Sarah Street,
performed another felony traffic stop, and found Mr. Haniotakis slumped over in the SUV.

45.     Pittsburgh medic units arrived, and began performing life-saving efforts on Mr.
Haniotakis, unfortunately to no avail.[1]

46.     During this high-speed chase and subsequent subject shooting, Trooper Nassan
observed Mr. Haniotakis commit numerous crimes, including but not limited to: (1) attempted
murder of a law enforcement officer (attempt at 18 Pa. C.S. § 901; murder of a law enforcement
officer at 18 Pa. C.S. § 2507; maximum 20-year-sentence at 18 Pa. C.S. § 1102(c)); (2)
aggravated assault (first-degree felony at 18 Pa. C.S. § 2702); (3) fleeing or attempting to elude
police officer (third-degree felony at 75 Pa. C.S. § 3733(a.2)(2)(iii)); (4) multiple counts of
recklessly endangering another person (second-degree misdemeanor at 18 Pa. C.S. § 2705); (5)
at least one count of leaving the scene of an accident involving damage to attended vehicle or
property (third-degree misdemeanor at 75 Pa. C.S. § 3743); (6) reckless driving (summary
offense at 75 Pa. C.S. § 3736); (7) careless driving (summary offense at 75 Pa. C.S. § 3714); (8)
exceeding maximum speed limits (summary offense at 75 Pa. C.S. § 3362); (9) multiple counts

---

[1] For ease of reference, a true and correct copy of a counseled-annotated map of the area,
showing the route of the high-speed chase is attached as Exhibit T.

of driving vehicle at unsafe speed near intersections, curves, or narrow roadways (summary offense at 75 Pa. C.S. § 3361); (10) multiple counts of failure to obey stop signs and yield signs (summary offense at 75 Pa. C.S. § 3323); and (11) multiple counts of leaving the scene of an accident involving damage to unattended vehicle or property (summary offense at 75 Pa. C.S. § 3745).  Additionally, had Mr. Haniotakis not fled, Trooper Nassan could have also charged him with: (1) driving under influence of alcohol or controlled substance (criminalized at 75 Pa. C.S. § 3802; graded up to first-degree misdemeanor by 75 Pa. C.S. § 3803 with mandatory minimum penalties at 75 Pa. C.S. § 3804); (2) driving while operating privilege is suspended or revoked (criminalized and graded up to first-degree misdemeanor by 75 Pa. C.S. § 1543); and (3) unauthorized use of vehicle registration (75 Pa. C.S. § 1372).

47.    Notably, though the foregoing events have been described in considerable detail, the entire high-speed chase from start to finish took only a few minutes, and the events surrounding the shooting took seconds.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs fail to state a claim upon which relief can be granted.

2.    Trooper Nassan pleads all applicable immunity defenses, including but not limited to qualified immunity, sovereign immunity, and all governmental immunities afforded by state and federal statute and regulation.

3.    Plaintiffs and Mr. Haniotakis were not deprived of any rights afforded to them under the United States Constitution.

4.    The injuries or damages allegedly suffered by Plaintiffs and Mr. Haniotakis were exclusively caused by the actions of others, including but not necessarily limited to, the actions of Mr. Haniotakis.

5.      Trooper Nassan pleads the defenses of self-defense and the defense of third parties.

6.      Some or all of Plaintiffs lack standing to pursue this action.

7.      At all relevant times, Trooper Nassan was acting within the scope of his employment.

8.      The Court lacks subject-matter jurisdiction over Count III in the event that Counts I or II are dismissed.

9.      Trooper Nassan was at all times acting pursuant to a duty required or authorized by statute or regulation; and, therefore, said acts were within the discretion granted to him by statute or statutorily authorized regulations.

10.     Plaintiffs' claims should be barred as a sanction for violations of Federal Rules of Civil Procedure.

11.     Trooper Nassan reserves the right to amend this pleading as needed or necessary, including but not limited to, amending the pleading to plead additional affirmative defenses.

Respectfully Submitted:


s/  Jerry S. McDevitt
Jerry S. McDevitt (Pa. 33214)
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone:     412-355-6500
Facsimile:     412-355-6501

Date:   November 11, 2010          Counsel for Defendant Trooper Samuel Nassan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing **DEFENDANT TROOPER SAMUEL**

**NASSAN'S ANSWER, ADDITIONAL QUALIFIED IMMUNITY ALLEGATIONS, AND**

**AFFIRMATIVE DEFENSES TO THE FIRST AMENDED COMPLAINT** on November 11,

2010, via the ECF system on the following counsel of record:


Geoffrey N. Fieger
Fieger, Fieger, Kenney, Johnson & Giroux, P.C.
19390 West 10 Mile Road
Southfield, MI 48075


Robert M. Giroux
Fieger, Fieger, Kenney, Johnson & Giroux, P.C.
19390 West 10 Mile Road
Southfield, MI 48075


Austin P. Henry
MILLS & HENRY
223 Fourth Avenue
200 Benedum Trees Building
Pittsburgh, PA 15222


Bryan Campbell
330 Grant Street
Suite 2330
Pittsburgh, PA 15219


Robert A. Willig
Office of Attorney General
564 Forbes Avenue
Manor Complex, 6th Floor
Pittsburgh, PA 15219


s/  Jerry S. McDevitt_____