**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DIANE ZION, *Individually and as Personal Representative of the Estate of Nicholas Haniotakis*, TAYLOR HANIOTAKIS, NIKKI HANIOTAKIS, and BENJAMIN HANIOTAKIS, <br><br> Plaintiffs, <br><br> v. <br><br> TROOPER SAMUEL NASSAN, SGT. TERRENCE DONNELLY, LT. DAVID HECKMAN, CAPT. SHELDON EPSTEIN, COMMISSIONER FRANK PAWLOWSKI, and MAJOR TERRY SEILHAMER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 09-383 |

## MEMORANDUM OPINION

**Conti, District Judge**

**I.    Introduction**

This action arises out of the fatal shooting of a fleeing motorist by two police officers. Pending before the court is a motion "for judgment on the pleadings" filed by the defendants pursuant to Federal Rule of Civil Procedure 12(c).  ECF No. 165.  For the following reasons, that motion will be denied.

**II.    Background**

The instant action concerns the shooting death of Nicholas Haniotakis ("Haniotakis") on the South Side of Pittsburgh, Pennsylvania.  (ECF No. 54 ¶¶ 10, 15.)  During the early morning hours of March 15, 2009, Haniotakis was shot to death while operating a sport utility vehicle ("SUV") bearing an Ohio license plate.  (ECF No. 54 ¶ 10; ECF No. 138 ¶ 11; ECF No. 162 at

5.)  The shots were fired by Trooper Samuel Nassan ("Nassan"), a member of the Pennsylvania State Police ("PSP"), and Sergeant Terrence Donnelly ("Donnelly"), a member of the City of Pittsburgh Bureau of Police ("Police Bureau").  (ECF Nos. 54 & 98 ¶ 15.)  At the time of the incident, Nassan and Donnelly were patrolling the South Side to ensure that motorists were not illegally driving under the influence of alcohol.  (ECF No. 98 ¶ 5.)

Diane Zion ("Zion") is the duly appointed representative of Haniotakis' estate.  (ECF No. 54 ¶ 2.)  Taylor Haniotakis ("Taylor"), Nikki Haniotakis ("Nikki") and Benjamin Haniotakis ("Benjamin") are Haniotakis' children.  (*Id.* ¶ 3.)  Rachel Takes ("Takes") and Dena Zouloufos ("Zouloufos") are Haniotakis' sisters.  (ECF No. 1 ¶ 3.)  Zion, Taylor, Nikki, Benjamin, Takes and Zouloufos filed the original complaint in this action against Nassan, Donnelly, Colonel Frank Pawlowski ("Pawlowski"), Major Terry Seilhamer ("Seilhamer"), Captain Sheldon Epstein ("Epstein") and Lieutenant David Heckman ("Heckman") on April 1, 2009, alleging that Haniotakis' rights under the United States Constitution and the common law of Pennsylvania were violated on the night of the shooting.  (ECF No. 1.)  The claims asserted against Nassan and Donnelly were based on the shooting itself.  (*Id.* ¶¶ 10-20.)  The claims asserted against Pawlowski, Seilhamer, Epstein and Heckman were predicated on their respective positions within the PSP and their alleged supervisory authority over Nassan.  (*Id.* ¶¶ 6-9, 29-34.)  In their complaint, the plaintiffs alleged that Nassan and Donnelly followed Haniotakis' SUV in a police car in order to call his attention to a broken headlight, and that they unconstitutionally "seized" him by employing deadly force after he had already "stopped his vehicle."  (*Id.* ¶¶ 10, 15.)  The plaintiffs averred that, at the time of the incident, Haniotakis "posed no threat of harm" to the approaching officers or bystanders, and that the officers were "protected by considerable distance and barriers between Haniotakis and themselves."  (*Id.* ¶¶ 17-18.)  It was specifically

alleged that Nassan inflicted the fatal blow to Haniotakis by shooting him in the back. (*Id.* ¶¶ 19-20.)

On August 26, 2009, Nassan and the remaining PSP defendants separately moved for the dismissal of the complaint.[1] (ECF Nos. 19 & 21.) In support of his motion to dismiss, Nassan challenged the sufficiency of the plaintiffs' allegations and raised the affirmative defense of qualified immunity. (ECF No. 20.) The other PSP defendants argued, *inter alia*, that they could not be held liable for Nassan's actions on the night of the shooting. (ECF No. 22 at 3-5.) Discovery was stayed at the request of the defendants. (ECF No. 42.)

The parties advanced their respective positions during a hearing conducted on November 19, 2009. (ECF No. 82.) After entertaining the parties' arguments, the court instructed the plaintiffs to file an amended complaint. (*Id.* at 92.) The PSP defendants were informed that the filing of the amended complaint would moot their pending motions to dismiss. (*Id.* at 93.)

On December 3, 2009, Zion, Taylor, Nikki and Benjamin filed their amended complaint. (ECF No. 54.) The amended complaint did not name Haniotakis' sisters, Takes and Zouloufos, as plaintiffs. (*Id.*) The remaining plaintiffs (hereinafter referred to as the "plaintiffs") again alleged that Haniotakis had "stopped his vehicle" before being shot. (*Id.* ¶ 15.) They averred that police officers were typically trained to use police vehicles as protective barriers, and that the vehicle used by Nassan and Donnelly to follow Haniotakis' SUV could have been used as a protective barrier at the time of the shooting. (*Id.* ¶¶ 17-18.) The amended complaint contained more detailed allegations concerning the behavior of the remaining PSP defendants and their supervisory relationships with Nassan. (*Id.* ¶¶ 6-9.)

On December 29, 2009, Nassan filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11. (ECF No. 63.) He described the allegations contained in the amended

---

[1] Donnelly did not file a motion to dismiss. (ECF No. 82 at 4.)

complaint as a "false depiction of events." (*Id.* ¶ 47.)  Specifically, Nassan argued that

Haniotakis had not actually "stopped" the SUV prior to the shooting, that the shooting had been

necessitated by Haniotakis' use of the SUV as a "weapon," and that the plaintiffs were falsely

alleging the factual predicate of a vehicular "stop" in order to overcome the defendants' qualified

immunity at the pleadings' stage.  (*Id.* ¶ 46.)

On January 26, 2010, Nassan, Donnelly and the other PSP defendants filed separate

motions to dismiss.  (ECF Nos. 70, 71 & 73.)  The court denied the motion for sanctions and all

three motions to dismiss in a memorandum opinion and order dated July 23, 2010.  (ECF No.

86.)  The defendants were instructed to file their answers on or before August 13, 2010, and the

plaintiffs were ordered to reply to the answers within the following twenty-one days.  (ECF No.

86 at 41.)  The defendants responded by filing three separate motions for reconsideration.  (ECF

No. 87, 88 & 89.)  The motions for reconsideration were denied on October 21, 2010.  (ECF No.

94.)  The defendants were ordered to file their answers on or before November 11, 2010.  (*Id.* at

13.)  The plaintiffs were given an additional twenty-one days to reply to the defendants' answers.

(*Id.*)  The court's decision was rendered without prejudice to the ability of the defendants to

move for a judgment on the pleadings after receiving the plaintiffs' replies.  (*Id.*)

Donnelly filed his answer on November 10, 2010.  (ECF No. 96.)  Nassan and the other

PSP defendants filed separate answers the next day.  (ECF Nos. 98 & 99.)  In their answers, the

defendants all denied that Haniotakis had "stopped" the SUV before being shot.  (ECF Nos. 96,

98 & 99 ¶ 15.)  They alleged that the SUV had "stopped" only after colliding with a parked car

during the course of a high-speech chase.  (*Id.*)  The defendants alleged that Haniotakis had

placed the SUV in "reverse" after the collision for the purpose of backing it into Nassan, and that

Haniotakis subsequently placed Donnelly in danger by moving the SUV forward.  (*Id.*)  They

indicated that Nassan and Donnelly discharged their weapons for the sole purpose of protecting themselves and others from serious bodily injury. (*Id.* ¶¶ 15, 19.) Nassan's answer included "additional qualified immunity allegations." (ECF No. 98 14-22, ¶¶ 1-47.) On November 23, 2010, the plaintiffs moved to strike the "additional qualified immunity allegations." (ECF No. 103.)

On December 1, 2010, the plaintiffs replied to the answers filed by Donnelly and the supervisory PSP defendants. (ECF Nos. 106 & 108.) On December 2, 2010, they replied to Nassan's answer. (ECF No. 113.) The plaintiffs admitted that Haniotakis' SUV collided with a parked, unoccupied vehicle before coming to a "stopped" position. (ECF Nos. 106, 108 & 113 ¶ 15.) They denied that the SUV posed a threat to the officers and bystanders at the time of the shooting. (*Id.*) The plaintiffs specifically alleged that Nassan and Donnelly shot Haniotakis while the SUV was "stopped" at an intersection, and that the officers were fifty yards behind the SUV when they discharged their weapons. (*Id.*)

On December 16, 2010, Nassan filed another motion for reconsideration, asking the court to reverse its prior decision denying his request for sanctions. (ECF No. 122.) He accused the plaintiffs of mischaracterizing the collision between the SUV and the parked vehicle as a "traffic stop" in order to overcome his entitlement to qualified immunity. (*Id.* at 4.) Nassan also filed a motion for limited discovery. (ECF No. 123.) The motion for discovery sought evidence pertaining to the plaintiffs' basis for alleging that Haniotakis had "stopped" the SUV prior to the shooting. (*Id.*) The plaintiffs responded to the motion for limited discovery on December 30, 2010. (ECF No. 127.) In their response, the plaintiffs attributed their beliefs about the circumstances surrounding the shooting to statements that were provided to plaintiffs' counsel by individuals who witnessed the incident. (*Id.* at 5.)

A hearing was held on December 17, 2010.  (ECF No. 125.)  During the hearing, the court orally denied the plaintiffs' motion to strike Nassan's "additional qualified immunity allegations."  (*Id.* at 30.)  In order to give the plaintiffs a fair chance to respond to Nassan's allegations, the court afforded the plaintiffs an opportunity to have an expert view the SUV and ordered the defendants to provide the plaintiffs with access to "investigative files" related to the case.  (*Id.* at 30-31.)

The plaintiffs replied to the "additional qualified immunity allegations" on February 14, 2011.  (ECF No. 138.)  On March 15, 2011, Nassan moved for a determination that the plaintiffs "admitted" some of his allegations by filing evasive responses.  (ECF No. 141.)  He filed a second motion for sanctions ten days later, claiming that the plaintiffs falsely described the circumstances surrounding the shooting.  (ECF No. 144 ¶ 100.)

Nassan's motion for limited discovery was partially granted on May 2, 2011.  (ECF No. 158.)  The plaintiffs were ordered to provide the defendants with the name, address and telephone number of "each person likely to have discoverable information" relevant to the case, along with "a description of the subject matter of that information."  (*Id.*)  They were also instructed to submit to the court, for *in camera* review, "all witness statements relied upon in their response to the motion for limited discovery."  (*Id.*)  The motion was denied in all other respects.  (*Id.*)  The plaintiffs turned their "witness statements" over to the court on May 10, 2011.  (ECF No. 159.)  Nassan filed a motion for reconsideration one week later, seeking an order requiring the plaintiffs to provide the defendants with access to the "witness statements" submitted to the court for *in camera* review.  (ECF No. 160.)

In a memorandum opinion and order dated August 25, 2011, the court denied Nassan's first motion for reconsideration and second motion for sanctions.  (ECF No. 162 at 24.)  The

motion for reconsideration pertaining to the "witness statements" was denied to the extent that it sought access to the materials submitted for *in camera* review. (*Id.* at 15-16.) Pursuant to an alternative request made by Nassan, the court entered an order requiring the preservation of those materials for the purpose of facilitating appellate review. (*Id.*) Nassan's motion for a determination that the plaintiffs had "admitted" his factual allegations by failing to provide adequate responses was granted only with respect to the admission that Haniotakis' SUV had made contact with an unoccupied vehicle prior to the shooting. (*Id.* at 20-21.) The motion was denied in all other respects, and the plaintiffs were granted leave to conform their responses to the requirements of Federal Rule of Civil Procedure 8(b). (*Id.* at 16-24.)

On September 14, 2011, the plaintiffs amended their responses to Nassan's "additional qualified immunity allegations." (ECF No. 163.) On October 4, 2011, the defendants collectively filed a motion for judgment on the pleadings. (ECF No. 165.) That motion is the subject of this memorandum opinion.

## III.    Standard of Review

The standard for deciding a motion for judgment on the pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) is not materially different from the standard for deciding a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6). *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010); *Christy v. We the People Forms & Serv. Ctrs., USA, Inc.*, 213 F.R.D. 235, 238 (D.N.J. 2003). Pursuant to Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." FED. R. CIV. P. 8(a)(2). This essentially means that a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Since the matter comes before the court in this posture, the allegations made by the plaintiffs are assumed to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## IV. Discussion

The amended complaint contains three counts. In Count I, the plaintiffs allege that Nassan and Donnelly violated Haniotakis' rights under the Fourth and Fourteenth Amendments to the United States Constitution by unreasonably "seizing" him with deadly force. (ECF No. 54 ¶¶ 45-51.) In Count II, they assert similar constitutional claims against Pawlowski, Seilhamer, Epstein and Heckman (the "supervising defendants") based on their alleged failure properly to train and supervise Nassan. (*Id.* ¶¶ 52-59.) Count III includes state law assault and battery claims against Nassan. (*Id.* ¶¶ 60-62.)

### A. The Fourth Amendment Claims (Counts I and II)

### 1. General Framework

The plaintiffs bring their federal constitutional claims pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. This remedial statute does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129 n.11 (1980). "A plaintiff cannot prevail in an action brought under § 1983 without

establishing an underlying violation of a federal constitutional or statutory right." *Ickes v. Borough of Bedford*, 807 F.Supp.2d 306, 315 (W.D.Pa. 2011).

The United States Supreme Court has declared that "§ 1983 is to be read in harmony with general principles of tort immunities rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). For this reason, the "qualified immunity" that was available to executive officials at common law may be invoked by executive officials sued under § 1983. *Hafer v. Melo*, 502 U.S. 21, 28-29 (1991). State officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is not only a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In this vein, the Supreme Court has frequently "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)(*per curiam*).

The first step in evaluating any claim brought under § 1983 is to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., AMEND. IV.  The prohibitions contained in the Fourth Amendment are applicable

to state actors by virtue of the Due Process Clause of the Fourteenth Amendment.  *Mapp v. Ohio*,

367 U.S. 643, 655-60 (1961).

A person is "seized" within the meaning of the Fourth Amendment when the government

terminates his or her freedom of movement through means intentionally applied.  *Brower v.*

*County of Inyo*, 489 U.S. 593, 596-97 (1989).  A police officer's intentional use of deadly force

to terminate the movement of a fleeing suspect constitutes a "seizure" subject to the constraints

of the Fourth Amendment.  *Curley v. Klem*, 499 F.3d 199, 203 n.4 (3d Cir. 2007).  "The Fourth

Amendment, however, does not proscribe all seizures."  *Pitchford v. Borough of Munhall*, 631

F.Supp.2d 636, 645 (W.D.Pa. 2007).  The *constitutionality* of a seizure depends on whether it is

*reasonable*.[2]  *Maryland v. Buie*, 494 U.S. 325, 331 (1990)(observing that "the Fourth

Amendment bars only unreasonable searches and seizures").

In order to be "reasonable" within the meaning of the Fourth Amendment, a seizure must

"be founded upon an objective justification."  *United States v. Mendenhall*, 446 U.S. 544, 551

(1980).  Where such a justification exists, a seizure may nevertheless contravene the Fourth

Amendment if it is conducted in an unreasonable manner.  *United States v. Stabile*, 633 F.3d

219, 235 (3d Cir. 2011).  In this case, the plaintiffs do not allege that Nassan and Donnelly

lacked an "objective justification" for seizing Haniotakis.  Instead, their claims are based on the

allegedly unreasonable *manner* in which Haniotakis was seized.  (ECF No. 54 ¶ 49.)

"The test of reasonableness under the Fourth Amendment is not capable of precise

definition or mechanical application."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  In determining

whether a seizure of an individual is reasonable, a court must "balance the nature and quality of

---

[2] The Fourth Amendment's "reasonableness" requirement applies to "searches" as well as "seizures."  *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  The plaintiffs' claims in this case, however, are not based on an allegedly unreasonable "search."

the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Additional factors include 'the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)). An officer's use of force to effectuate a seizure "must be justified by the need for the specific level of force employed." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). The "reasonableness" of an officer's actions must be judged under an objective standard, without regard to his or her "underlying intent or motivation." *Graham*, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force," and an officer's good intentions will not "make an objectively unreasonable use of force constitutional." *Id.* Regardless whether the level of force employed is "deadly" or "nonlethal," the relevant question is whether it is "reasonable" under the precise circumstances confronted by the officer attempting to complete the seizure. *Ickes*, 807 F.Supp.2d at 322.

## 2. Sufficiency of the Allegations Against Nassan and Donnelly

Pittsburgh's annual St. Patrick's Day Parade was held on Saturday, March 14, 2009. (ECF No. 138 ¶ 5.) The shooting at issue in this case allegedly took place on the South Side of

Pittsburgh between 1:00 A.M. and 2:00 A.M. on March 15, 2009. (ECF No. 54 ¶ 10.) Nassan and Donnelly followed Haniotakis' SUV in an unmarked police car driven by Nassan.[3] (ECF No. 138 ¶¶ 13-23.) Both vehicles apparently traveled down Wharton Street, which came to a dead end at 22nd Street. (ECF No. 138 ¶¶ 24-28.) Haniotakis turned right on 22nd Street, causing the SUV to collide with a parked, unoccupied car. (*Id.* ¶ 28.) After the collision, Nassan and Donnelly stopped and exited the police car. (*Id.* ¶ 32.) Haniotakis reversed the SUV enough to evade the parked car and continued to drive down 22nd Street. (*Id.* ¶¶ 34-38.) Nassan and Donnelly apparently fired shots at the SUV during the intervening period of time. (*Id.* ¶¶ 36, 39.) One of the bullets discharged from Nassan's weapon struck Haniotakis in the back. (*Id.* ¶ 44.) The SUV proceeded through a traffic light on East Carson Street and crashed into a telephone pole at the corner of 22nd Street and Sarah Street. (*Id.* ¶ 43.) Nassan and Donnelly found Haniotakis "slumped over" inside the SUV. (*Id.* ¶ 44.) Although emergency medical responders arrived at the scene, they were unable to save Haniotakis' life. (*Id.* ¶ 45.)

The accounts of the incident related by the parties differ in several respects. The defendants allege that Haniotakis was driving erratically through the South Side prior to the shooting, causing Nassan and Donnelly to pursue the SUV by means of a "high-speed chase." (ECF No. 98 ¶¶ 13-30.) The plaintiffs generally deny these allegations.[4] (ECF No. 138 ¶¶ 13-30.) The defendants maintain that, after the collision between the SUV and the parked car on 22nd Street, Haniotakis placed Nassan in imminent danger by quickly moving the SUV in reverse and causing it to collide with the police car. (ECF No. 98 ¶¶ 34-35.) They further contend that

[3] Nassan's "additional qualified immunity allegations" describe the particular streets traveled by Haniotakis, Nassan and Donnelly during the course of an alleged "high-speed chase." (ECF No. 98 at 17-18, ¶¶ 13-23.) The plaintiffs point out that they have not yet had an opportunity for discovery in this case, and that they are not yet in a position to admit or deny several of the particular allegations made by Nassan. (ECF No. 138 ¶¶ 13-23.)

[4] Some of the plaintiffs' denials are based on Federal Rule of Civil Procedure 8(b)(5), which provides that a party who "lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state," and that such a statement "has the effect of a denial." FED. R. CIV. P. 8(b)(5).

Haniotakis placed Donnelly in imminent danger by moving the SUV "to the right" and accelerating down 22nd Street. (*Id.* ¶ 38.) The defendants rely on the officers' need to protect themselves and others as a justification for the use of deadly force. (*Id.* ¶¶ 35-43.) They assert that Haniotakis' actions "posed a serious risk of harm" to individuals among "the large crowds enjoying the St. Patrick's Day festivities at the numerous bars located on East Carson Street." (*Id.* ¶ 42.) The plaintiffs aver that Nassan "was not standing directly behind or in the path of" the SUV when he fired the fatal shot into Haniotakis' back, and that Donnelly was not at "risk of harm" at the time of the shooting. (ECF No. 138 ¶¶ 35, 38.) They also allege that the SUV was moving slowly after it hit the parked car and before the shooting, and that no bystanders were placed in danger. (*Id.* ¶ 43; ECF No. 163 ¶ 43.) There is an additional dispute about whether Haniotakis knew that Nassan and Donnelly were attempting to stop his vehicle. The defendants insist that Nassan activated the emergency lights on the unmarked police car before proceeding behind the SUV, and that Nassan and Donnelly issued verbal commands to Haniotakis after exiting the police car on 22nd Street. (ECF No. 98 ¶¶ 16, 33.) The plaintiffs deny that Haniotakis observed the operation of the emergency lights or heard the verbal commands issued by the approaching officers. (ECF No. 138 ¶¶ 16, 33.)

To the extent that the accounts of the incident provided by the parties conflict, the court must credit the allegations made by the plaintiffs. *Iqbal*, 556 U.S. at 679 (remarking that, at the pleadings stage, a court must assume the veracity of all "well-pleaded factual allegations"). Although the amended complaint alleged that Nassan and Donnelly exited their police car and approached Haniotakis' SUV after the SUV had "stopped" moving, the plaintiffs now acknowledge that the SUV had "stopped" only after colliding with a parked vehicle on 22nd Street. (ECF No. 138 ¶ 28.) They nevertheless aver that Haniotakis' SUV did not pose a threat

to the officers or bystanders after the collision, and that the officers acted unreasonably in discharging their weapons. (*Id.* ¶¶ 35-43.) The defendants maintain that the plaintiffs cannot proceed with their claims without filing an amended complaint, given the difference between their original allegations and their responses to Nassan's "additional qualified immunity allegations." (ECF No. 174 at 7-10.) The crux of the defendants' argument is that the plaintiffs are attempting to recharacterize their claims without amending their pleadings. (*Id.*)

A plaintiff cannot proceed against a defendant on a theory that is fundamentally inconsistent with his or her own pleadings. *Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256-257 (3d Cir. 2010). In this case, however, the "pleadings" include the plaintiffs' responses to Nassan's "additional qualified immunity allegations." Federal Rule of Civil Procedure 7(a)(7) specifically classifies "a reply to an answer," if ordered by a court, as a "pleading" allowed in federal court. FED. R. CIV. P. 7(a)(7). Where the averments contained in a plaintiff's complaint sufficiently allege that a state official has perpetrated a constitutional violation but lack the specificity necessary to facilitate an evaluation of the official's potential entitlement to qualified immunity, a court must exercise its discretion to ensure that the official is "not subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). A court can accomplish this objective by ordering the plaintiff to respond to the defendant's answer, or by ordering the plaintiff to file a more definite statement. *Id.*; *Thomas v. Independence Twp.*, 463 F.3d 285, 301 (3d Cir. 2006); FED. R. CIV. P. 7(a)(7); FED. R. CIV. P. 12(e). The former course of action was chosen when the plaintiffs were ordered to respond to the "additional qualified immunity allegations" contained in Nassan's answer. (ECF No. 86 at 41; ECF No. 125 at 30-31.) The plaintiffs' responses, which are themselves "pleadings," serve as the functional equivalent of an amended complaint. *Thomas*,

463 F.3d at 301. Moreover, the plaintiffs' responses did not alter the fundamental character of the Fourth Amendment claims asserted in the amended complaint. (ECF No. 54 ¶¶ 45-51.) When read through the prism of the plaintiffs' most recent "pleadings," those Fourth Amendment claims remain "unreasonable seizure" claims grounded in the allegedly unjustified deployment of deadly force. (ECF No. 138 ¶¶ 33-43.) The plaintiffs are free to pursue their claims in accordance with their responses to Nassan's "additional qualified immunity allegations." The defendants' belief to the contrary is in error. (ECF No. 174 at 7-10.)

In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court declared that it was "reasonable" for a police officer to employ "deadly force to prevent the escape of an apparently unarmed suspected felon" only where the officer had "probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer or others." *Id.* at 3. The Supreme Court explained:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Garner*, 471 U.S. at 11. The Supreme Court went on to clarify that, under certain circumstances, an arresting officer could use "deadly force" to "seize" a fleeing felon when acting on the basis of "probable cause to believe that he [or she] has committed a crime involving the infliction or threatened infliction of serious physical harm." *Id.*

The plaintiffs premise their claims on the rule established in *Garner*. (ECF No. 171 at 26-27.) They maintain that no interest that the officers may have had in apprehending

Haniotakis was "so vital as to outweigh [Haniotakis'] interest in his own life." *Garner*, 471 U.S. at 11. The defendants argue that *Garner* does not govern this case. (ECF No. 166 at 14.) They assert that this case is governed by the Supreme Court's subsequent decision in *Scott v. Harris*, 550 U.S. 372 (2007). (*Id.*) The positions taken by the parties in this case can only be understood by reference to the facts at issue in *Garner* and *Scott*.

*Garner* involved the shooting of an unarmed, nondangerous suspect who was trying to evade capture by climbing over a fence. *Garner*, 471 U.S. at 3-4. The suspect had stolen a purse and $10.00 from a nearby home shortly before being shot by a police officer. *Id.* at 4. Because the suspect had never placed the approaching officer or anyone else in danger of "serious physical harm," the Supreme Court held that the use of deadly force to "seize" the suspect had been "constitutionally unreasonable." *Id.* at 11. The defendants correctly point out that *Garner* did not involve a "vehicular pursuit." (ECF No. 166 at 14.)

In *Scott*, the Supreme Court determined that it had been "reasonable" for a police officer to "stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's car from behind." *Scott*, 550 U.S. at 374. The "fleeing motorist," who was ultimately rendered a quadriplegic as a result of the incident, had been recklessly traveling at speeds exceeding eighty-five miles per hour before being rear-ended by a police car. *Id.* at 374-75. The evidentiary record contained a videotape depicting "the events in question." *Id.* at 378. After viewing the tape, the Supreme Court described the motorist's attempt to evade capture as "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380 (footnote omitted). In determining as a matter of law that the officer had acted reasonably in terminating the chase by initiating a calculated collision, the Supreme Court explained that the "reasonableness" inquiry required

under the Fourth Amendment accounted not only for "the number of lives at risk," but also for "their relative culpability." *Id.* at 384. Since the motorist had "intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight," the officer's deliberate decision to stop the chase by causing a risky collision was not deemed to be "unreasonable." *Id.* at 384-85. The Supreme Court summarized its holding by declaring that the Fourth Amendment does not preclude an officer from placing a fleeing motorist "at risk of serious injury or death" by taking actions that are necessary "to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders." *Id.* at 386.

The Supreme Court explained in *Scott* that *Garner* had not established "a magical on/off switch [triggering] rigid preconditions whenever an officer's actions constitute[d] 'deadly force.'" *Id.* at 382. The holding in *Garner* was described as an application of the Fourth Amendment's more generalized standard of "reasonableness" to a set of facts involving the use of "deadly force." *Id.* In this respect, *Scott* deemphasized the distinction between "deadly force" and nonlethal force. *Id.* at 383 ("Whether or not Scott's actions constituted application of 'deadly force,' all that matters is whether Scott's actions were reasonable."). It was specifically noted, however, that an officer's act of ramming a fleeing vehicle from behind did not produce "the near *certainty* of death" that would be produced by his or her act of "pulling alongside a fleeing motorist's car and shooting the motorist." *Id.* at 384 (emphasis in original).

The defendants read *Scott* to mean that no Fourth Amendment violation can occur when police officers use deadly force to terminate the flight of a motorist who drives "in an unsafe manner" and fails to "fully surrender" to law enforcement authorities. (ECF No. 166 at 15.) The holding in *Scott*, however, was not as categorical as the defendants suggest. *Scott*, 550 U.S. at 383 ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth

Amendment context is admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.'").  The decision in *Scott* did not articulate "a mechanical, *per se* rule" permitting the use of life-threatening force whenever an individual seeks to evade capture through the operation of a motor vehicle.  *Id.* at 386 (Ginsburg, J., concurring).  The Fourth Amendment "recognizes that no single set of legal rules can capture the ever-changing complexity of human life."  *Georgia v. Randolph*, 547 U.S. 103, 125 (2006)(Breyer, J., concurring).  In this vein, the Fourth Amendment's standard of "reasonableness" requires that the "totality of the circumstances" be considered in determining whether a particular "search" or "seizure" is constitutional.  *United States v. Price*, 558 F.3d 270, 278 n.6 (3d Cir. 2009).

The collision of Haniotakis' SUV with a parked car prior to the shooting does not necessarily mean that it was objectively reasonable for Nassan and Donnelly to discharge their weapons.  *Abraham v. Raso*, 183 F.3d 279, 293 (3d Cir. 1999)("A more fundamental point is that given the doubts about whether Abraham was close to hitting someone when he backed, the fact that he collided forcefully with a parked car (if it is a fact) does not by itself show that Abraham posed a significant threat of death or serious physical injury to other people.").  The plaintiffs aver that Nassan and Donnelly were not in danger at the time of the shooting, and that Haniotakis' operation of the SUV did not put other individuals at risk.  (ECF No. 138 ¶¶ 34-43.)  Specifically, the plaintiffs allege that the officers were not in the path of the SUV immediately before the shooting, and that the SUV was moving slowly when the officers opened fire.  (*Id.* ¶¶ 35-40.)  If the officers did not have probable cause to believe that Haniotakis posed a threat to the physical well-being of others, it was not objectively reasonable for them to shoot him.  *Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no

threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

"Even where an officer is initially justified in using force, he [or she] may not continue to use such force after it has become evident that the threat justifying the force has vanished." *Lamont v. State of New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011). A threat justifying an initial deployment of force can sometimes vanish within a matter of seconds. *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)(holding that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated"). "A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." *Abraham*, 183 F.3d at 294. The relevant question, therefore, is whether Haniotakis posed a danger to the officers or others when Nassan and Donnelly discharged their weapons. The plaintiffs aver that shots were fired when Haniotakis was fifty yards in front of Nassan and Donnelly. (ECF No. 138 ¶ 40.) They further allege that Haniotakis was driving the SUV in a slow, nonthreatening way at the time of the shooting. (*Id.*) Even if it is assumed that Haniotakis posed a threat to others when he crashed the SUV into a parked car, it does not necessarily follow that the threat continued to exist when Nassan and Donnelly opened fire. It is also worth noting that the act of shooting Haniotakis while he was driving the SUV could have placed other individuals in much greater danger than they would have been in had Haniotakis' flight been permitted to continue. *Vaughan v. Cox*, 343 F.3d 1323, 1332-33 (11th Cir. 2003)(remarking that the act of shooting the fleeing driver of a fast-moving vehicle "would transform the risk of an accident on the highway into a virtual certainty," thereby increasing the very danger that the shooting was supposed to eliminate).[5]

---

[5] In *Scott v. Harris*, 550 U.S. 372, 384 (2007), the Supreme Court observed that the act of ramming a police car into a vehicle driven by a fleeing motorist did not produce "the near *certainty* of death" produced by the act of "pulling

Relying on *Scott*, the defendants argue that the plaintiffs' version of events is so "blatantly contradicted by the record" that it should be disregarded. (ECF No. 166 at 25-26.) The problem with this argument is apparent from the very sentence in *Scott* relied upon by the defendants. In *Scott*, the Supreme Court explained that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for *summary judgment*." *Scott*, 550 U.S. at 380 (emphasis added). The motion presently before the court is a motion "for judgment on the *pleadings*." FED. R. CIV. P. 12(c)(emphasis added). "Standards of pleading are not the same as standards of proof." *Phillips v. County of Allegheny*, 515 F.3d 224, 246 (3d Cir. 2008). The plaintiffs are under no obligation to *prove* the truth of their allegations at the pleadings stage.[6] *Rife v. Borough of Dauphin*, 625 F.Supp.2d 212, 221 (M.D.Pa. 2008).

The evidence uncovered in connection with the limited discovery already conducted in this case cannot control the resolution of the defendants' motion. Since a deceased individual "is

---

[5] alongside the motorist's car and shooting the motorist." *Scott*, 550 U.S. at 384 (emphasis in original). *Vaughan v. Cox*, 343 F.3d 1323, 1326-27 (11th Cir. 2003), was cited in *Scott* as an example of a case involving a *shooting* designed to stop a vehicular pursuit. The fact that a shooting is more likely than a calculated collision to cause the death of a fleeing motorist informs the "reasonableness" inquiry required under the Fourth Amendment. *Scott*, 550 U.S. at 384 (describing how a court should "go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger *probability* of injuring or killing a single person")(emphasis added). The court notes that three of the decisions relied upon by the defendants involved vehicular pursuits that were terminated by the use of calculated collisions rather than by the discharging of firearms. *Pasco v. Knoblauch*, 566 F.3d 572, 574-75 (5th Cir. 2009); *Beshers v. Harrison*, 495 F.3d 1260, 1263-64 (11th Cir. 2007); *Abney v. Coe*, 493 F.3d 412, 413-14 (4th Cir. 2007).

[6] Most of the decisions relied upon by the defendants were rendered at the summary-judgment stage. *Pasco v. Knoblauch*, 566 F.3d 572, 574-75 (5th Cir. 2009); *Marion v. City of Corydon*, 559 F.3d 700, 701 (7th Cir. 2009); *Beshers v. Harrison*, 495 F.3d 1260, 1263-64 (11th Cir. 2007); *Abney v. Coe*, 493 F.3d 412, 413-14 (4th Cir. 2007); *Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002). The only exception is *Long v. Slaton*, 508 F.3d 576, 578 (11th Cir. 2007), which was decided at the motion-to-dismiss stage. In *Long*, the United States Court of Appeals for the Eleventh Circuit held that a sheriff's deputy had acted "reasonably" in shooting a psychotic individual who had unlawfully seized control of the deputy's police cruiser. *Long*, 508 F.3d at 580-81. In so holding, however, the Court of Appeals stressed that its decision was based on the unique predicament caused by a "mentally unstable" individual who had cloaked himself "with the apparent authority of a law enforcement officer," and who "had been warned that deadly force would be used if he did not leave the cruiser." *Id.* at 581, 583-84. The unusual factual circumstances at issue in *Long* are clearly distinguishable from those at issue in this case.

unable to testify," a case involving the use of *deadly* force requires an exhaustive examination of both physical and testimonial evidence. *Abraham*, 183 F.3d at 294 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). The plaintiffs have not yet been afforded an opportunity to conduct broader discovery or impeach the evidence described by the defendants. The defendants cannot establish their entitlement to a judgment on the *pleadings* by relying on a "record" that has not yet been developed. (ECF No. 166 at 25-30.) In this respect, their reliance on *Scott* is misplaced. Not only was the decision in *Scott* rendered at the summary-judgment stage, but it was also rendered on the basis of a videotape depicting the very events that were disputed by the parties. *Scott*, 550 U.S. at 378. *Scott* was merely a common-sense application of the adage that "a picture is worth a thousand words." *United States v. Drozdowski*, 313 F.3d 819, 821 (3d Cir. 2002). It provides no support for the defendants' novel proposition that the plaintiffs' *allegations* can be dismissed as untrue before the completion of discovery.[7]

### 3. Qualified Immunity – Nassan and Donnelly

The defendants argue that they are entitled to qualified immunity even if they violated the Fourth Amendment by using deadly force to "seize" Haniotakis. (ECF No. 166 at 17-25.) In support of their position, they make two basic assertions. First, the defendants contend that the general standard announced in *Garner* was not sufficiently specific to place Nassan and Donnelly on notice that the Fourth Amendment prohibited them from discharging their weapons to stop Haniotakis' flight. (*Id.* at 22-23.) Second, the defendants maintain that the Supreme Court's subsequent decisions in *Brosseau v. Haugen*, 543 U.S. 194 (2004)(*per curiam*), and *Scott* made it even less clear that Nassan and Donnelly could not constitutionally use deadly force

---

[7] At the present time, the court will not reconsider its prior decisions denying Nassan's motions for sanctions. (ECF No. 166 at 31.)

against Haniotakis under the circumstances of this case. (*Id.* at 23-25.) Since these arguments are significantly interrelated, they will be addressed together.

The inquiry as to whether a defendant is entitled to qualified immunity "must be undertaken in light of the specific context" of the facts alleged or presented. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has instructed courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2084 (2011). In some instances, a constitutional question may be "so factbound" that a resulting decision defining the contours of the specific constitutional right at issue may provide "little guidance" in cases involving different factual settings. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). In other instances, however, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271 (1997).

"The general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S.Ct. at 2084. The rule established in *Garner*, however, is "not inherently incapable of giving fair and clear warning" that the use of deadly force is constitutionally unreasonable when it is not necessary to prevent an individual from inflicting harm on others. *Lanier*, 520 U.S. at 271. "It has long been the law that an officer may not use deadly force against a suspect unless the officer *reasonably believes* that the suspect poses a threat of serious bodily injury to the officer or others." *Lamont*, 637 F.3d at 185 (emphasis added). This general principle can overcome an officer's invocation of qualified immunity "even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In *Abraham v. Raso*, 183 F.3d 279, 293 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained that a police officer could not constitutionally shoot a fleeing motorist to death merely because he had collided with a parked car moments before the shooting. The Court of Appeals declared that the mere occurrence of the collision had not provided the officer with a reasonable basis for concluding that the motorist "posed a significant threat of death or serious physical injury to other people." *Abraham*, 183 F.3d at 293. Although the officer alleged that the motorist had tried to hit her with his car, that fact was disputed by the parties. *Id.* at 282. The Court of Appeals addressed that issue as follows:

> Even assuming Raso was in front of the car and was in danger at some point, a jury could find, notwithstanding her testimony, that she did not fire until it was no longer objectively reasonable for her to believe she was in peril. A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect. *See, e.g., Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). We can, of course, readily imagine circumstances where a fleeing suspect would have posed such a dire threat to an officer, thereby demonstrating that the suspect posed a serious threat to others, that the officer could justifiably use deadly force to stop the suspect's flight even after the officer escaped harm's way. But in our case, if the jury decides that Raso did not fire until safely out of harm's way, the jury could also reasonably decide that Abraham's conduct was not so dangerous as to warrant Raso's use of deadly force.

*Id.* at 294-95. The relevant factual issue in *Abraham* was not whether the officer had been "in danger as a matter of fact" at the time of the shooting, but rather whether her subjective apprehension of such a danger had been "objectively reasonable." *Id.* at 294. The plaintiffs rely on *Abraham* as authority for their position. (ECF No. 171 at 4, 29.)

The defendants posit that *Abraham* was abrogated by the Supreme Court's subsequent decisions in *Brosseau* and *Scott*. (ECF No. 166 at 23 n.23.) The argument advanced by the defendants lacks merit for several reasons. First, the Court of Appeals for the Third Circuit has continued to apply *Abraham* in the aftermath of *Brosseau* and *Scott*. *Lamont*, 637 F.3d at 181-

82.  Second, *Scott* did not involve a deployment of force that was *nearly certain* to result in a suspect's death.  *Scott*, 550 U.S. at 384.  The Supreme Court expressly noted that the calculated collision at issue in that case could not be equated with the act of "pulling alongside a fleeing motorist's car and shooting the motorist."  *Id.*  Unlike *Scott*, *Brosseau* was a case in which a police officer had shot a fleeing driver.  *Brosseau*, 543 U.S. at 195-97.  The Supreme Court determined that the officer was entitled to qualified immunity without determining whether she had, in fact, violated the plaintiff's Fourth Amendment rights.[8]  *Id.* at 201.  Since the shooting at issue in that case had occurred on February 21, 1999, the officer's entitlement to qualified immunity turned on the state of the law as of that date.  *Id.* at 200 n.4.  *Abraham* was decided on July 26, 1999.  *Abraham*, 183 F.3d 279.  Because the decision in *Abraham* postdated the shooting challenged in *Brosseau*, it was not relevant to the Supreme Court's inquiry.  Indeed, the Supreme Court specifically referenced *Abraham* as a decision that could not be considered for the purpose of determining whether the officer sued in *Brosseau* was entitled to qualified immunity.  *Brosseau*, 543 U.S. at 200 n.4.  In light of the Supreme Court's specific citation to *Abraham*, it is patently obvious that *Brosseau* did not abrogate that decision.  Moreover, the holding in *Brosseau* does not preclude the plaintiffs from relying on *Abraham* for the purpose of overcoming the defendants' entitlement to qualified immunity.  Given that Haniotakis was shot almost ten years *after* July 26, 1999, *Abraham* is certainly relevant to the court's analysis in this case.  *Id.*

The officer responsible for the shooting in *Brosseau* acted pursuant to a reasonable belief that the fleeing motorist had entered his vehicle in order to "retrieve a weapon."  *Brosseau*, 543 U.S. at 196.  This factor distinguishes the instant case from the situation presented in *Brosseau*.

---

[8] The Supreme Court did not grant *certiorari* to decide whether the officer had violated the plaintiff's Fourth Amendment rights.  *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004)(*per curiam*).

*Sigley v. City of Parma Heights*, 437 F.3d 527, 537 (6th Cir. 2006); *Smith v. Cupp*, 430 F.3d 766, 776 (6th Cir. 2005). Had Nassan and Donnelly acted on the basis of a reasonable belief that Haniotakis was armed *and dangerous*, this would be a different case. *Lamont*, 637 F.3d at 183 (explaining that "an officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable *and the circumstances otherwise justify the use of such force*")(emphasis added). The plaintiffs allege that Haniotakis was unarmed at the time of the shooting. (ECF No. 54 ¶ 16.) Although the defendants assert that Haniotakis used his SUV as a "weapon" immediately before being shot, the plaintiffs take issue with that assertion. (ECF Nos. 96, 98 & 99 ¶ 16; ECF Nos. 106, 108 & 113 ¶ 16.) At this stage, the plaintiffs' allegations are assumed to be true, and the version of the facts put forth by the defendants is immaterial.[9] *Jones v. Harris*, 665 F.Supp.2d 384, 394 (S.D.N.Y. 2009).

The amended complaint, when read through the prism of the plaintiffs' responses to Nassan's "additional qualified immunity allegations," continues to allege that Haniotakis was shot to death at a time when the officers were not in the path of the SUV immediately before the shooting and his car was traveling slowly when the shooting occurred. Under those circumstances, the allegations are sufficient to support an inference he posed no serious threat to the physical well-being of the officers or others. (ECF No. 54 ¶¶ 10-20; ECF No. 138 ¶¶ 16-45.) It is clearly-established law that "an officer may not use deadly force against a suspect unless the officer *reasonably believes* that the suspect poses a threat of serious bodily injury to the officer or others." *Lamont*, 637 F.3d at 185 (emphasis added). This is true both as a general matter and in the "more specific context" of a police officer's use of a deadly firearm to prevent the escape of a fleeing motorist. *Lytle v. Bexar Cnty.*, 560 F.3d 404, 417-418 (5th Cir. 2009). Furthermore, the holding in *Abraham* provided Nassan and Donnelly with notice that a "passing risk" to their

---

[9] *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004)(*per curiam*), was decided at the summary-judgment stage.

safety did not provide them with "an ongoing license to kill an otherwise unthreatening suspect." *Abraham*, 183 F.3d at 294. For these reasons, the allegations made by the plaintiffs, which must be accepted as true for purpose of the defendants' motion for judgment on the pleading, are sufficient to establish that Haniotakis' Fourth Amendment rights were violated and overcome the defense of qualified immunity raised by Nassan and Donnelly. *Thomas*, 463 F.3d at 301.

### 4. Supervisory Defendants

Although Pawlowski, Seilhamer, Epstein and Heckman also move for a judgment on the pleadings, they rely solely on the premise that Nassan and Donnelly did not violate Haniotakis' clearly-established Fourth Amendment rights. (ECF No. 166 at 32-33.) They advance no independent arguments about why the claims asserted against them should not proceed to discovery. Since the court determined that Nassan and Donnelly are not entitled to qualified immunity at this stage, the position taken by the supervisory defendants is based on an incorrect premise and need not be considered further.[10]

For the foregoing reasons, the defendants' motion for judgment on the pleadings will be denied with respect to the plaintiffs' Fourth Amendment claims. (ECF No. 54 ¶¶ 45-59.)

### B.    The Assault and Battery Claims Against Nassan (Count III)

Under Pennsylvania law, an individual commits the tort of battery when he or she intentionally causes a "harmful or offensive" contact with another person's body. *C.C.H. v. Phila. Phillies, Inc.*, 940 A.2d 336, 340, n.4 (Pa. 2008). An individual commits the tort of assault when he or she acts to cause an actual battery or to place another person in "imminent apprehension" of a battery, thereby causing the person to be "put in such imminent apprehension." *Jackson v. Pa. Bd. of Prob. & Parole*, 885 A.2d 598, 601 n.2 (Pa.Commw.Ct.

---

[10] The court previously determined that the allegations against Pawlowski, Seilhamer, Epstein and Heckman were sufficient to survive a motion to dismiss. (ECF No. 86 at 25-29.)

2005)(quoting the RESTATEMENT (SECOND) OF TORTS § 21 (1965)). The plaintiffs aver facts showing that Nassan committed the torts of assault and battery by shooting Haniotakis without justification.[11] (ECF No. 54 ¶¶ 60-62.) Nassan does not dispute the common-sense proposition that the act of shooting another person can constitute the torts of assault and battery under Pennsylvania law. Instead, he argues that he enjoys immunity from the plaintiffs' assault and battery claims. (ECF No. 166 at 33-36.) His affirmative defense is grounded in Pennsylvania's Sovereign Immunity Act, 42 PA. CONS. STAT. § 8501 *et seq.*, which shields state employees from monetary liability in many instances.

The plaintiffs argue that Nassan's act of shooting Haniotakis constituted "willful misconduct." (ECF No. 171 at 43-44.) Under Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), 42 PA. CONS. STAT. § 8541 *et seq.*, an employee of a *local* agency may be held liable for acts constituting "willful misconduct." 42 PA. CONS. STAT. § 8550. For this reason, a *local* police officer is not immune from civil liability when he or she intentionally uses "unnecessary or excessive force" to "seize" an individual. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293-94 (Pa. 1994). As a member of the PSP, however, Nassan is a *state* police officer.[12] (ECF No. 54 ¶ 4.) The provision of the PSTCA permitting local employees to be held liable for their "willful misconduct" is inapplicable to claims brought against state employees. *La Frankie v. Miklich*, 618 A.2d 1145, 1149 n.4 (Pa.Commw.Ct. 1992); *Yakowicz v. McDermott*, 548 A.2d 1330, 1334 n.5 (Pa.Commw.Ct. 1988).

Article I, § 11, of the Pennsylvania Constitution provides, in pertinent part, that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." PA. CONST., ART. I, § 11. This constitutional provision

---

[11] The court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).
[12] The plaintiffs do not assert assault and battery claims against Donnelly. (ECF No. 54 ¶¶ 60-62.)

clearly gives Pennsylvania's General Assembly the power to specify the types of actions that can

be maintained against the Commonwealth of Pennsylvania. *Lingo v. Philadelphia Housing*

*Authority*, 820 A.2d 859, 861 (Pa.Commw.Ct. 2003). Pursuant to that authority, the General

Assembly has enacted 1 PA. CONS. STAT. § 2310, which provides:

> **§ 2310. Sovereign immunity reaffirmed; specific waiver**
> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it
> is hereby declared to be the intent of the General Assembly that the
> Commonwealth, *and its officials and employees acting within the scope of their
> duties*, shall continue to enjoy sovereign immunity and official immunity and
> remain immune from suit except as the General Assembly shall specifically waive
> the immunity. When the General Assembly specifically waives sovereign
> immunity, a claim against the Commonwealth *and its officials and employees*
> shall be brought only in such manner and in such courts and in such cases as
> directed by the provisions of Title 42 (relating to judiciary and judicial procedure)
> or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 PA. CONS. STAT. § 2310 (emphasis added). Except where a separate statutory provision

provides to the contrary, section 2310 shields Commonwealth officials and employees from civil

liability for torts committed "within the scope of their duties." *Story v. Mechling*, 412 F.Supp.2d

509, 518-19 (W.D.Pa. 2006).

The applicable language of the Sovereign Immunity Act states that, except as otherwise

provided therein, no statutory provision "shall constitute a waiver of sovereign immunity."[13] 42

PA. CONS. STAT. § 8521(a). The provision waiving sovereign immunity in certain instances is

codified at 42 PA. CONS. STAT. § 8522(a), which provides:

> **§ 8522. Exceptions to sovereign immunity**
> **(a) Liability imposed.**—The General Assembly, pursuant to section 11 of
> Article I of the Constitution of Pennsylvania, does hereby waive, in the instances

---

[13] A separate provision of the Sovereign Immunity Act provides that "[n]othing contained [therein] shall be
construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh
Amendment to the Constitution of the United States." 42 PA. CONS. STAT. § 8521(b). This provision, however, has
no bearing on the instant case. The plaintiffs sued Nassan only in his personal capacity. (ECF No. 54 ¶ 4.) The
Eleventh Amendment does not shield state officials sued in their personal capacities from monetary liability for
actions taken pursuant to their official duties. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991).

set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a *negligent act* where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

42 PA. CONS. STAT. § 8522(a)(emphasis added). The term "Commonwealth party" is defined as "[a] Commonwealth agency and any employee thereof, but *only with respect to an act within the scope of his office or employment*." 42 PA. CONS. STAT. § 8501 (emphasis added).

Assault and battery constitute "intentional torts" under Pennsylvania law. *Keenan v. City of Philadelphia*, 936 A.2d 566, 567-570 (Pa.Commw.Ct. 2007). The commission of such intentional torts cannot be fairly characterized as "negligence." *Aetna Casualty & Surety Co. v. Roe*, 650 A.2d 94, 103 (Pa.Super.Ct. 1994)(concluding that "no precedent exists for recovery in negligence for injuries suffered as a result of the commission by a tortfeasor of the intentional torts of assault and battery"). Consequently, an intentional tort does not qualify as a "negligent act" within the meaning of section 8522(a). *Strothers v. Nassan*, Civil Action No. 08-1624, 2009 U.S. Dist. LEXIS 30208, at *12, n.12 (W.D.Pa. Apr. 9, 2009). Moreover, the claims asserted against Nassan in this case do not fall within "the instances set forth in subsection (b)."[14] 42 PA. CONS. STAT. § 8522(a); *Faust v. Commonwealth*, 592 A.2d 835, 839 (Pa.Commw.Ct. 1991)(explaining that "intentional tort claims" do not fall within the specific categories of claims for which sovereign immunity has been waived). Since Pennsylvania's waiver of sovereign immunity does not embrace the assault and battery claims brought by the plaintiffs in this case, Nassan's entitlement to immunity from those claims depends *entirely* on whether he committed

---

[14] The statutory waiver of sovereign immunity contained in 42 PA. CONS. STAT. § 8522(b) extends only to cases involving the following nine categories: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 PA. CONS. STAT. § 8522(b)(1)-(9).

"an act within the scope of his office or employment" when he shot Haniotakis. 42 PA. CONS. STAT. § 8501; *Holt v. Nw. Pa. Training P'ship Consortium, Inc.*, 694 A.2d 1134, 1140 (Pa.Commw.Ct. 1997)("Unlike for local agency employees, willful misconduct does not vitiate a Commonwealth employee's immunity because sovereign immunity protects a Commonwealth employee *acting within the scope of his or her employment* from liability, even for intentional acts which cause emotional distress.")(emphasis added).

In *Natt v. Labar*, 543 A.2d 223 (Pa.Commw.Ct. 1988), the Pennsylvania Commonwealth Court articulated the standard for determining the scope of an officer's employment for immunity purposes by stating as follows:

> Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not *unexpected* by the employer.

*Natt*, 543 A.2d at 225 (emphasis added).[15] This language suggests that, when the use of force is involved, the scope of an individual's employment depends on the *expectations* of his or her employer. *Strothers*, 2009 U.S. Dist. LEXIS 30208, at *26-27. In light of the duties typically performed by law enforcement officials, it is to be "reasonably expected" that a police officer may have to discharge his or her firearm "in rare instances." *Howard v. Zaney Bar*, 85 A.2d 401, 403 (Pa. 1952). The dispositive question is whether the PSP "reasonably expected" Nassan to shoot fleeing motorists under circumstances similar to those presented in the South Side on the morning of March 15, 2009.

In support of his motion for judgment on the pleadings, Nassan posits that the PSP expects that its officers will sometimes need to use a "reasonable" degree of force that does not

---

[15] The language used by the Commonwealth Court of Pennsylvania mirrors the language found in the *Restatement (Second) of Agency*, § 228. *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa.Super.Ct. 1979).

contravene clearly-established law. (ECF No. 166 at 34.) This line of reasoning, however, is premised on a conclusion that has already been rejected. The plaintiffs' allegations, which are assumed to be true at this stage, establish that Nassan violated Haniotakis' clearly-established right to be free from deadly "seizures." *Lamont*, 637 F.3d at 185; *Abraham*, 183 F.3d at 294-95. Although Nassan remains free to contest the plaintiffs' allegations as the case progresses, his position does not entitle him to a judgment on the *pleadings*. Fed. R. Civ. P. 12(c).

The Pennsylvania courts have recognized that "an assault committed by an employee upon another person for personal reasons *or in an outrageous manner* is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of employment." *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa.Super.Ct. 1998)(emphasis added). Nassan maintains that force is unexpected only when it is "motivated by personal animus." (ECF No. 166 at 34.) He insists that "outrageousness" is merely one factor relevant to a determination as to whether an employee's conduct is "motivated by personal reasons." (*Id.* at 34 n.29.) The position taken by Nassan, however, does not square with the applicable jurisprudence. Addressing the issue of an employer's vicarious liability for the tortious acts committed by an employee, the Pennsylvania Superior Court stated in *Fitzgerald v. McCutcheon*, 410 A.2d 1270 (Pa.Super.Ct. 1979), that "the employer is not responsible as a matter of law" where "the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason." *Id.* at 1272. Since an employee is generally authorized to use only "reasonable" measures to achieve a result desired by his or her employer, an "outrageous" act may lie beyond the scope of his or her employment even where it constitutes "a means of accomplishing an authorized result." *Lunn v. Yellow Cab Co.*, 169 A.2d 103, 104 (Pa. 1961). A high degree of "outrageousness" can take an employee's actions "outside

the scope" of his or her employment. *Haas v. Barto*, 829 F.Supp. 729, 734 (M.D.Pa. 1993); *Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 551 (Pa. 1955). Even if it is assumed that a finding of "private malice" is necessary to establish that Nassan did not act within the scope of his employment when he shot Haniotakis, such a finding need not be predicated on a preexisting adversarial relationship between the two individuals. If Nassan "seized" Haniotakis "in an outrageous manner," that fact may *itself* suggest that Nassan acted on the basis of "his own private malice."[16] *Lunn*, 169 A.2d at 105.

Nassan argues that since he acted "under color of" Pennsylvania law for purposes of § 1983, he necessarily acted "within the scope of his office or employment" for purposes of the Sovereign Immunity Act. (ECF No. 166 at 35-36.) The fact that Nassan acted "under color of" Pennsylvania law may have some bearing on whether he acted "within the scope of his office or employment." *Hafer*, 502 U.S. at 27-28 ("The requirement of action under color of state law means that Hafer may be liable for discharging respondents precisely because of her authority as auditor general."); *Mitchell v. Luckenbill*, 680 F.Supp.2d 672, 683 n.6 (M.D.Pa. 2010)(noting that a determination that police officers had acted "outside the scope of their employment" could undermine the plaintiffs' contention that the officers had acted "under color of state law"). Nonetheless, § 1983's "statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). The actions of a state official may "constitute state action for purposes of the Fourteenth Amendment" even when they exceed the limits of the official's authority. *Id.* This court has already recognized that a police officer may sometimes act both

---

[16] The court acknowledges that, in some contexts, employees act within the scope of their employment even when their actions are expressly forbidden. *Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2000). When physical force is involved, however, the *degree* of force used has a direct impact on whether it is used within the scope of an individual's employment. *Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 551 (Pa. 1955).

"under color of state law" and beyond the scope of his or her employment. *Hickenbottom v. Nassan*, Civil Action No. 03-223, 2007 U.S. Dist. LEXIS 24336, at *139-40 (W.D.Pa. Mar. 29, 2007). This situation can arise when a police officer "fir[es] a gun at a person who poses no threat to the officer." *Id.* at *140. That is precisely what the plaintiffs allege in this case. (ECF No. 54 ¶¶ 15-21; ECF No. 138 ¶¶ 34-43; ECF No. 163 ¶ 43.) Under these circumstances, a determination that Nassan acted "within the scope of his office or employment" does not inevitably flow from a concession that he acted "under color of" Pennsylvania law. *Hickenbottom*, 2007 U.S. Dist. LEXIS 24336, at *139-41.

The defendants' motion for judgment on the pleadings will be denied with respect to the assault and battery claims asserted against Nassan. (ECF No. 54 ¶¶ 60-62.) The court will be in a better position to consider Nassan's defense of sovereign immunity when the record is fully developed. Nassan remains free to raise this defense in a motion for summary judgment.

## V.    Conclusion

For the foregoing reasons, the defendants' motion for judgment on the pleadings (ECF No. 165) will be denied in its entirety.[17] Although the allegations made by the plaintiffs are sufficient to overcome the affirmative defenses raised by the defendants at this stage, the defendants can raise those defenses again if discovery does not produce evidence to support the plaintiffs' allegations. *Behrens v. Pelletier*, 516 U.S. 299, 306-07 (1996)(discussing a defendant's ability to raise the defense of qualified immunity "at successive stages"). In holding that the defendants are not entitled to a judgment on the pleadings, the court expresses no opinion concerning the probative value of the limited evidence produced in connection with Nassan's earlier motions for sanctions. The relative weight of such evidence will be more

---

[17] In light of this disposition, the defendants' request for a hearing is moot. (ECF No. 165.)

appropriately dealt with when the evidentiary record is fully developed.  An appropriate order follows.

By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Dated:  June 27, 2012                              United States District Judge